**Robert C. HICKERSON, on his own behalf and on behalf of all others similarly situated, Plaintiffs-Appellees,**

v.

**VELSICOL CHEMICAL CORPORATION, a Delaware corporation, et al., Defendants-Appellants.**

No. 84–1608.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1985.

Decided Dec. 3, 1985.

Rehearing and Rehearing En Banc Denied Jan. 29, 1986.

---

Glen H. Kanwit, Hopkins & Sutter, Chicago, Ill., for defendants-appellants.

John C. Jacobs, Plotkin & Jacobs, Chicago, Ill., for plaintiffs-appellees.

Before CUDAHY and POSNER, Circuit Judges, and BROWN, Senior District Judge.*

CUDAHY, Circuit Judge.

This case arises out of the conversion by amendment of defendant Velsicol Chemical Corporation's defined-contribution deferred profit-sharing plan (the "Former Plan")[1] into a defined-benefit pension plan (the "Present Plan").[2] Plaintiff Robert C. Hick-

---

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. The Velsicol Chemical Corporation and Included Subsidiaries Deferred Profit Sharing Plan.

2. The Velsicol Corporation Pension Plan. The Former Plan and the Present Plan will be referred to together as the "Plan."

erson brought this action individually and on behalf of a class consisting of all Velsicol employees who were participants in the Former Plan at the time of conversion and continued to be employed by Velsicol after conversion, alleging *inter alia* that Velsicol and the trustees of the two plans, also defendants, violated the Employee Retirement Income Security Act of 1974 ("ERISA"), codified primarily in title 29 of the United States Code, when it converted the Former Plan into the Present Plan. The district court granted the plaintiffs' motion for partial summary judgment on the issue of liability, finding that the conversion violated ERISA sections 404(a)(1)(A)(i), 403(c)(1), 406(a)(1)(D) and 404(a)(1)(D), 29 U.S.C. §§ 1104(a)(1)(A)(i), 1103(c)(1), 1106(a)(1)(D) and 1104(a)(1)(D), respectively, and the terms of the Former Plan. *Hickerson v. Velsicol Chemical Corp.*, No. 81 C 2543 (N.D.Ill. October 4, 1983). The parties stipulated the amount of damages, and final judgment was entered. The only issue on appeal is whether the district court erred in concluding that the conversion violated ERISA or the terms of the Former Plan. After giving much consideration to the issue, we conclude that such a conversion does not necessarily violate ERISA or the Former Plan, and thus we reverse the district court's entry of summary judgment. Because we find that a question of fact remains as to whether the terms of this conversion satisfy ERISA and the Former Plan, we remand this case to the district court.

## I.

The facts underlying this action are not in dispute, although the characterization of the interests at issue is sharply contested.[3]

---

3. The plaintiffs' interest in their accounts is characterized as "ownership" of "property" by the plaintiffs and as a "vested claim" for "equivalent benefits" by Velsicol.

The parties also differ over the characterization of the changes from the Former Plan to the Present Plan:

There is some dispute among the parties as to whether the defendants['] actions should be characterized as a conversion of the Profit

The following statement of facts is taken substantially from the district court opinion.

Velsicol adopted the Former Plan on December 1, 1956, and it became effective December 31, 1956. The Former Plan was a defined-contribution profit-sharing plan for eligible salaried employees. Velsicol was to contribute an amount (in its discretion) between 2 and 10 percent of its annual net profits, up to the maximum amount deductible under section 404(a) of the Internal Revenue Code (the "Code"), 26 U.S.C. § 404(a), for the benefit of participating employees. Employees made no contributions to the Former Plan.

Velsicol's contributions were allocated to individual book accounts maintained for each participant. Each year participants would receive a "Statement of Your Personal Account" from the Former Plan trust which informed the participant of the total amount credited to his account at the end of the year. The accounts were periodically credited or debited to reflect the investment gains or losses experienced by the trust. Thus from year to year a participant's account might show an increase, a decrease, or no change, depending upon the relative sizes of Velsicol's contributions and the trust's investment gains or losses. The assets held in the trust were not segregated or earmarked for particular participants but were maintained in a common corpus. Over the eighteen-year period from 1957 to 1975, the investment income of the Former Plan trust corpus averaged 5.77% per year, ranging from a gain of 20.55% in 1971 to a loss of 19.44% in 1974.

Amounts allocated to a participant's account vested on a pro rata basis over a ten-year period, so that any employee who left Velsicol before completing ten years of service forfeited a portion of his account balance. No participant was entitled to a distribution of any portion of his account prior to his "initial distribution date" as defined in the Former Plan.[4] The plan provided that the amount of a participant's account balance would then be paid in one or a combination of specified ways, at the trustees' discretion.[5] Upon the termination or death of an employee whose account had been vested, the full amount would be immediately due and payable. Plaintiff Hickerson and other members of the class had worked for Velsicol for at least ten years and thus had a vested interest in the Former Plan.

The Former Plan was converted to the Present Plan on April 1, 1975. Approximately 563 employees were participants in the Former Plan on March 31, 1975, and they continued to work for Velsicol beyond April 1, 1975. These employees constitute the class Hickerson represents. As of March 31, 1975, the book accounts of these participants in the Former Plan (the "Profit Sharing Participants") became fully vested regardless of length of service and therefore became nonforfeitable. On March 31 the balance in the Former Plan fund was $4,400,154. The named plaintiff, Hickerson, had accumulated a total of $30,485.00 in the Former Plan.

The Present Plan is a defined-benefit pension plan, under which Velsicol promises employees a fixed monthly benefit upon retirement and contributes to the pension fund enough money each year to cover

Sharing Plan to a Pension Plan or whether the actions can be characterized as a termination of the Profit Sharing Plan with the newly created Pension Plan introduced as a replacement. All parties, however, agree on the events that transpired; only the legal significance of those events is in dispute. Dist.Ct.Op. at 4 n. 3.

4. A participant's "initial distribution date" was determined by one of the following events: (1) normal retirement at age sixty-five; (2) retirement, with consent of the employer, at age fifty-

five; (3) retirement at any time after December 31, 1957 due to total and permanent disability; (4) death; or (5) termination of employment for any other reason. Former Plan § 5.1.

5. The three options were: (1) periodic installment payments for up to 10 years, based on account balance at retirement plus simple interest at the legal savings account rate; (2) purchase of an annuity contract with the account balance; or (3) a single lump sum payment of the account balance. Former Plan § 5.2.

benefits accrued by employees. The Present Plan provides both a standard formula for computing a participant's normal retirement pension (utilizing the participant's total number of months of continuous service) and an alternate method for computing the retirement pension for those employees who had previously participated in the Former Plan. The Present Plan provides that the amount of a Profit Sharing Participant's pension benefits will be the greater of these alternative computations:

1) the normal retirement pension computed under the pension formula for *all* continuous months of service,

*or*

2) the sum of:

a) the value of the Participant's profit sharing account in the former Profit Sharing Plan as of March 31, 1975, plus interest at 5% compounded annually until retirement, and

b) the value of the benefit computed under the pension formula taking into account *only* the months of continuous service earned after March 1975 when the Profit Sharing Plan was converted into the Pension Plan.

*See* Present Plan, § 6.01(b). Thus, when Velsicol created the Present Plan it guaranteed the Profit Sharing Participants 5% per year on their Former Plan account balances regardless of how the investment of those funds might turn out. Velsicol also provided that all investment income made on the Present Plan funds (which included the $4.4 million balance from the Former Plan fund) would remain in the Present Plan fund.[6]

The Present Plan attained more than respectable earnings on its funds. According to the district court, the average return actually realized by the pension trust during the seven years following conversion was 11.55%. In addition, the plaintiffs assert that the 1982 investment earnings of the trust fund amounted to 25%. These earnings represent a differential of 6.55% (or more if the plaintiffs are correct about 1982) between the level of earnings guaranteed by the company on Former Plan accounts and the amount actually earned on the funds. It is for this differential that the plaintiffs sue.

The number of participants in the Present Plan has grown as. Velsicol has added new employees. The original 563 Profit Sharing Participants have been joined as participants in the Present Plan by some 200–250 new Velsicol employees. Despite the increased number of participants, Velsicol's contributions to the Present Plan fund decreased during the seven years from 1975 to 1982, to the point that in both 1980 and 1981 Velsicol was not required to make any contributions to the fund.

The complaint initiating this action was filed in the Circuit Court of Cook County, Illinois, *Hickerson v. Velsicol Chemical Corp.*, No. 81 CH 2398 (Cir.Ct. of Cook Cty. filed March 31, 1981), and was removed to the federal district court for the Northern District of Illinois on May 7, 1981. The plaintiff's motion for class certification was granted on August 23, 1982, and Hickerson now represents all Velsicol employees who, as of March 31, 1975, were participants in the Former Plan and who continued to be employees of Velsicol after April 1, 1975. The district court also dismissed counts I and II of the complaint, which asserted violations of common law fiduciary and contractual duties, on the grounds that ERISA preempts state law and is the exclusive source for determining the propriety of defendants' conduct. Plaintiffs do not appeal this dismissal and we express no opinion on its correctness.

The two sides then filed cross motions for summary judgment on count III, which alleged the violations of ERISA at issue

---

6. The Internal Revenue Service issued Velsicol a favorable determination letter on November 21, 1977, ruling that the terms of the Present Plan complied with the requirements of the Code. Appendix to Brief for Appellee, at 55. The attention of the IRS had apparently been drawn to the possibility of a reversion of the plan assets to Velsicol by a letter from an official in the Department of Labor, dated November 7, 1977. *Id.* at 14.

here. The district court found that the defendant had violated ERISA, as well as the terms of the Former Plan, by not guaranteeing to the participants in the Former Plan the actual investment earnings on the funds allocated to them as of the time of conversion in 1975. The district court thus entered partial summary judgment on liability for plaintiffs, and the parties stipulated to the amount of damages. Final judgment was then entered, and the defendants appeal.

## II.

Although the sort of conversion attempted here—from a profit-sharing plan to a defined-benefit pension plan—does not seem unusual, we have been able to unearth nothing in the statutes, regulations, cases or commentary which could be regarded as dispositive of the issues raised by the plaintiffs. The plaintiffs' basic contention is that they are entitled to the earnings realized since 1975 on the funds allocated to their respective accounts at the time of conversion, even though the Plan purportedly operated on a defined-benefit basis after that date. Thus, the central problem in this case is to determine whether the Profit Sharing Participants have or had an interest in the assets allocated to their accounts in the Former Plan that would entitle them to those earnings.

It is true—and apparently conceded by all parties [7]—that at the time of conversion the Profit Sharing Participants had some sort of vested "interest" in their respective accounts and that no amendment, modification or conversion of the Former Plan could have divested the Participants of such an interest. But there is sharp disagreement as to what that interest was and what rights in the trust corpus it conferred. If the interest was akin to an "ownership" interest or to the interest of an income beneficiary in an ordinary trust not subject to unilateral amendment, then presumably these participants in the Former Plan may not be divested of the investment return actually realized by the fund in which they had such an interest. On the other hand, if it was not, their equities in the account balances could have been cut off or limited at the time of conversion, and they would not have a claim to future investment earnings.

The plaintiffs also rely on the argument that the Former Plan terminated at the time of the conversion and that the original participants, under the provisions of Section 8.3,[8] had a right to a distribution of the funds in their accounts as of that time. A decision about termination requires examination of the terms of the Former Plan and of ERISA.

The impetus of this lawsuit was, of course, provided by the relatively robust investment performance of the pension trust fund after conversion. As the defendants have pointed out, under a defined-benefit plan the company assumes the investment risk, which prior to conversion here seemed to be considerable. It is not for us to say that Velsicol's assumption of the investment risk and guarantee of pension benefits did not appear ex ante to be legitimately in the best interest of the participants at the time.[9] It may well have

---

7. The district court noted that Velsicol's own actions, in attempting to accommodate the profit-sharing interests and in giving full credit for profit-sharing principal and earnings as of March 1, 1975, belied the defendants' apparent contention in the court below that the employees never had a vested interest in the Plan. Dist.Ct.Op. at 16.

8. "Upon termination of the plan ... [t]he amount standing to the credit of each Participant ... shall represent the final account of each such person.... [T]he trustees shall distribute the credit balances ... in cash or in kind, and with payment thereof by the Trustees,

all obligations under the plan in respect of any Participant or other person shall be discharged." Former Plan, § 8.3.

9. During the eighteen-year period in which the Former Plan was in operation, the fund's investment earnings averaged 5.77% per year. The yearly earnings fluctuated dramatically, however, from a high of a 20.55% gain (1971) to a low of a 19.44% loss (1974). A gain or loss in any particular year would permanently increase or reduce the retirement benefit of any employee retiring in that year.

also been the case that Velsicol's assumption of the investment risk at that time justified a guarantee of no more than a 5% interest on the Profit Sharing Participants' accounts. Perhaps this was a good bargain that would have been readily accepted by the Profit Sharing Participants had they been given an opportunity to accept or reject it.

For two reasons, however, the fact that the defendants' assumption of the investment risk may have been in the plaintiffs' interest is not determinative of the basic issue. First, the outstanding feature of the period after conversion was not investment risk but rather rich investment reward. The funds which were carried over from the Former Plan into the Present Plan realized large investment gains which in part funded the pension benefits of the employees who became participants in the Plan after conversion; this reduced the requirements on Velsicol to provide funds for the Plan. The plaintiffs have noted in their brief that, partly as a result of the excellent post-conversion investment performance of the funds accumulated prior to 1975, the average contribution to the plan by Velsicol in the seven-year period subsequent to conversion amounted to $311,445. By way of contrast, the average annual contribution by the company to the profit sharing plan for the seven years prior to 1975 was $409,334. This, the plaintiffs claim, shows that the fund accumulated and allocated to the accounts of the Profit Sharing Participants before 1975 had "inured to the benefit" of the subsequent participants and Velsicol. It was this arguable inurement of benefits which formed the principal basis for the determination of the district court that there had been a viola-

tion of ERISA sections 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); 403(c)(1), 29 U.S.C. § 1103(c)(1); 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).[10]

The second reason why Velsicol's shouldering of risk and the possible attractiveness of the conversion to the Profit Sharing Participants in 1975 is only partially relevant is because the defendants do not rely upon the participants' consent at the time of conversion. Rather, they rely solely upon the power of Velsicol to amend the Former Plan according to its terms. Section 8.2 of the Former Plan provided that the plan might be "wholly or partially amended or otherwise modified" at any time by resolution of the board of directors of Velsicol, subject to the qualification that no part of the Trust Fund should be used for any purpose other than the exclusive benefit of the participants. The district court held that this provision was violated, as the Trustees' unilateral action exceeded their power to amend. Dist.Ct.Op. at 14.

The district court decided this case for the plaintiffs on the basis of what it conceived to be basic trust principles—"simplistic" principles in the view of the defendants, who have taken strong exception to this approach and have argued throughout that this mode of analysis ignores ERISA and the regulations issued both under it and under the Internal Revenue Code. We think that this is a close case. We do not agree with the plaintiffs that they necessarily suffered grave injustices because of Velsicol's conversion of a profit-sharing plan into a defined-benefit pension plan. However, Velsicol's possibly good inten-

---

**10.** ERISA section 403(c)(1), 29 U.S.C. § 1103(c)(1), states that

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), states that a plan fiduciary

shall not cause the plan to engage in a transaction, if he knows or should know that such

plan constitutes a direct or indirect ... transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan....

Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), requires that a plan fiduciary

discharge his duties with respect to the plan solely in the interests of the participants and their beneficiaries and ... in accordance with the documents and instruments governing the plan....

tions and the various incommensurable benefits of shifting from a defined-contribution to a defined-benefit basis do not necessarily lead us to the conclusion that Velsicol was justified in handling matters as it did.

We begin by considering whether a conversion such as that from the Former Plan to the Present Plan may be made under ERISA and the Code and under the terms of the Former Plan. We will then examine whether this particular conversion is satisfactory.

### III.

### A. Plaintiffs' Asserted Ownership Interest

■ The plaintiffs assert that under ERISA and under the terms of the Former Plan they have an interest in the assets of the Former Plan trust that precludes the conversion that Velsicol has effected here. While we agree that the plaintiffs have a vested right to a benefit at least equal to the value of their account balances at the time of conversion, we do not think that this vested right is equivalent to an "ownership interest" in the assets, as plaintiffs appear to contend. There is nothing in either the Former Plan itself or in ERISA and its implementing regulations which would appear to confer on the plaintiffs anything equivalent to an ownership interest; indeed, both suggest that the plain-

tiffs have only a right to the value of their accounts determined as of the date of conversion. *Cf. Bianchin v. McGraw-Edison Co.*, 438 F.Supp. 585, 588 (W.D.Pa.1976), *aff'd mem.*, 564 F.2d 89 (3d Cir.1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978).[11]

Various provisions of the Former Plan trust seem to militate to one degree or another against the concept that the Participants in effect own the assets which are represented by their various accounts. Thus, section 5.1 of the Former Plan reads:

> No Participant shall be entitled to a distribution of any portion of the values standing to his credit in his account prior to his Initial Distribution Date....

Section 7.3 of the Former Plan provides:

> No Participant or other person shall have any interest in, or right to, any part of the assets thereof, except as and to the extent expressly provided in the plan.

Section 7.4 of the Former Plan provides:

> No account in the trust fund shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be null and void....

Section 8.2, which pertains to amendment and modification of the plan,[12] is also im-

---

**11.** *Bianchin,* a pre-ERISA case involving a challenge to the conversion of a profit-sharing plan into a defined-benefit pension plan, is not directly on point because there the conversion was not a unilateral act of the employer but rather was entered into pursuant to a collective bargaining agreement. Its result, however, does tend to support the conclusions we reach here about the nature of a profit-sharing participant's interest in his trust account at the time of conversion. The court held that the only thing "which might be considered 'vested' in the plaintiffs ... [at the time of conversion]—the resignation *values* of their accounts—were unaffected by the collective bargaining agreement, which more than adequately preserved for each participant the entire *value* of his profit-sharing account as of that date." (emphasis in original).

We also note here *Delgrosso v. Spang & Co.,* 769 F.2d 928 (3d Cir.1985), which plaintiffs have brought to our attention pursuant to circuit rule

11. It, too, is inapposite to the issues raised in this case. In *Delgrosso,* a defined-contribution plan was converted into a defined-benefit plan six years before the attempted plan amendment which gave rise to litigation. In 1974, when the conversion took place, the Pension Agreement contained a clause that forbade the reversion of any surplus assets in the account to the employer. In 1980, the employer attempted to unilaterally amend the plan so as to allow it a reversion of surplus assets upon termination of the plan. The court held that the employer did not have the power under the Pension Agreement to so amend the plan. *Id.* at 935.

**12.** The district court relied specifically on this provision in holding that the provisions of the Former Plan had been violated and therefore that the defendants had violated section 404(a)(1)(D) of ERISA. Dist.Ct.Op. at 14.

portant in this regard. Section 8.2 provides that

> [t]he plan may be wholly or partially amended, or otherwise modified, ... provided, however, that no such modification or amendment shall permit any part of the trust fund ... to be used for, or diverted to, purposes other than the exclusive benefit of the Participants, ... and provided further, that no such modification or amendment shall operate to reduce or eliminate the account of any person or persons acquired prior to the effective date of such modification or amendment....

This provision appears to confer a very broad power to amend the plan and thus correspondingly reduces the degree of ownership that the Profit Sharing Participants can claim. Interpretation of the scope of this section requires a determination of the meaning of "Participants" as used there. The district court apparently construed the word "Participants" to mean only the participants under the Former Plan. But the word could as easily mean not only those covered under the Former Plan but also those who joined the defined-benefit plan into which it was converted. If we view the arrangement as encompassing through amendment the subsequent defined-benefit scheme as well as the earlier profit-sharing plan, it would be more appropriate to construe the word "Participants" as referring to participants in the plan both before and after it was amended.[13] Under that interpretation there is no violation of ERISA with respect to the subsequent participants apparent from the face of Section 8.2. If the plan can be amended legally to allow this conversion, then the ownership interest that plaintiffs claim is conferred by the Plan is by definition not large enough to prohibit such an amendment.[14]

Thus, while the trust documents are consistent with the proposition that plaintiffs acquired a sort of vested interest in the *trust* as of the time of conversion (as is conceded by the defendants), they do not

---

**13.** "Participant" was a defined term under the Former Plan, meaning

> [e]ach ... [salaried employee] who, on or before December 31, 1956, shall have completed the requisite twelve months' service with the Company.... Each other employee of the Company or of an included subsidiary shall be a Participant as of the date of the adoption of the plan by an included subsidiary or as of the December 31 next following the date as of which he shall have completed the requisite twelve months of service with the Company, one of its included subsidiaries, or any Affiliated Company.

Former Plan, § 2.2. The Present Plan also defines "Participant," and its definition broadens eligibility somewhat. *See* Present Plan, Article II & § 3.03 (employee becomes a participant on the July 1 or January 1 after he completes a 12-month period in which he has worked 1000 hours).

Assuming an otherwise proper amendment of the plan to effect a different funding mechanism, there is nothing that suggests that this definition would not encompass all participants meeting eligibility requirements, pre- or post-conversion.

On the other hand, suppose that "Participant" had been defined under the Former Plan as the district court implicitly defined it, that is, as referring only to those who participated in the Former Plan. The definition would have been framed in such a way as to account for plan amendments and would have read something like this: "The term 'Participants' shall mean all employees participating in the plan on the date of an amendment but shall not include those who first participate in the plan on a date subsequent to an amendment." This was not the form employed—and with good reason. Consider the following amendment: "All employees who first participate after this date shall have amounts credited to their accounts as at present. However, any earnings of the plan fund greater than 5% which are attributable to such employee's account balance shall not be credited to the employee's account, but may either be used to reduce Velsicol's contribution to the employee's account the following year, or distributed pro rata to current retired beneficiaries of the plan, at the trustee's option." The general form of the district court's interpretation would not prohibit this amendment, yet it seems plain to us that § 8.2 was meant to prohibit such an amendment, which denies benefits to some employees eligible for the plan. This leads us to believe that the proper reading of the definition should be "The term 'Participant' means any employee participating in the plan, whether first participation is before or after the date of an amendment."

**14.** One is still required, however, to examine the question whether the conversion resulted in inurement of benefit or diversion of assets directly or indirectly to Velsicol. *See infra* Part IV.

suggest that the plaintiffs had an interest in the *assets* of the trust fund sufficient to carry with it the earnings of the fund in the years following the conversion. *Cf. Bianchin v. McGraw-Edison, supra.*

Having concluded that the Former Plan does not suggest that the plaintiffs have an ownership interest which precludes the conversion here, we turn to ERISA. Surprisingly, ERISA does not appear to discuss the effect of a plan amendment that converts a defined-contribution plan into a defined-benefit plan. But we do not think that ERISA and the accompanying regulations support plaintiffs' argument because ERISA's fiduciary principles protect employees' claims to accrued benefits, not their ownership of pension fund assets. *See Salazar v. Sandia Corp.,* 656 F.2d 578 (10th Cir.1981) ("The plaintiffs under the Plan had, and have, a right to retirement benefits but they do not have rights to particular contributions and never did); *cf. Bianchin, supra.* This is demonstrated by the various other transformations, which have the same impact on participants' interests, that ERISA does permit.

In the context of a merger or consolidation of two plans, and the transfer of assets or liabilities between two plans, ERISA and the Code, as elucidated by their accompanying regulations, assume the possibility of the conversion of a defined-contribution plan into a defined-benefit plan. Such a conversion is contemplated as the first step of a merger or consolidation of a defined-contribution with a defined-benefit plan. Treasury Regulation § 1.414($l$)–1($l$) provides as follows:

> In the case of a merger of a defined benefit plan with a defined contribution plan, one of the plans before the merger should be converted into the other type of plan (i.e., the defined benefit converted into a defined contribution, or the defined contribution converted into a defined benefit)....

This same general rule is repeated at ERISA § 208, 29 U.S.C. § 1058, and Code §§ 401(a)(12) & 414($l$), 26 U.S.C. §§ 401(a)(12) & 414($l$), and also applies when assets or liabilities are transferred between plans.

■ The validity of the attempted merger under ERISA is measured by comparing the "benefits on a termination basis" of the participants immediately *before* the proposed merger with the benefits on a termination basis of the participants immediately after. Treas.Reg. § 1.414($l$)–1(a)(2)(ii). *See also* ERISA § 208, 29 U.S.C. § 1058; Code §§ 401(a)(12), 414($l$), 26 U.S.C. §§ 401(a)(12), 414($l$) (substantially similar provisions). The benefits on a termination basis of a participant in a defined-contribution plan is the balance in such a participant's individual account at the time the plan is terminated. 26 U.S.C. § 411(a)(3). This is the amount that ERISA guarantees the participant in the event of such a transaction.

If the conversion of one plan from defined-contribution to defined-benefit and the subsequent merger of the two remaining plans is successfully accomplished, the surviving plan is deemed to be a "single plan" under which the combined assets of both pre-merger plans are available to pay benefits to all post-merger participants, regardless of the allocation of funds in any pre-merger accounts. *See* Treas.Reg. § 1.414($l$)–1(b)(1).

The participants in the defined-contribution plans which the statute and the regulations allow to be converted to effect a merger have the same vested interest in their account balances that the Profit Sharing Participants have in theirs. Yet their rights to a future income stream from investment earnings that would accrue to them post-conversion is cut off by the conversion. The statute is quite clear that they are entitled to be vested in their accrued benefits and the regulations measure the validity of the merger by whether those values are preserved. But once the merger has taken place, participants have no paramount rights to any portion of the new trust corpus. ERISA does not support the plaintiffs' contention that they have an ownership interest in the assets of the Former Plan trust.

## B. Termination of the Plan

■ Plaintiffs' other principal argument for having what amounts to an ownership interest in the assets of the trust fund, and thus a right to their post-1975 investment earnings, is that the Former Plan terminated at the time of the conversion. If there had been a termination, the Profit Sharing Participants would have been entitled to an immediate distribution of the assets of the Former Plan trust, 26 U.S.C. § 411(a)(3), which they could have invested in a rising market themselves. But we do not believe that a termination occurred, either under the terms of the plan or by the requirements of ERISA.

The plaintiffs contend that the Former Plan was terminated by operation of its Section 8.3. In the district court the plaintiffs argued that the Present Plan was so entirely different from the Former Plan that the Present Plan could not have been a "continuation" or an "amendment" of the Former Plan. The plaintiffs also argued that in effect the profit-sharing plan has stopped functioning: Velsicol ceased making contributions based on its profits; account earnings no longer accrued directly to the participants; and, in fact, the Present Plan explicitly refers to the profit-sharing plan as the "Former Plan". The plaintiffs therefore contended that the plain language suggests a termination. The district court did not rule on the termination argument, although the plaintiffs renew it in abbreviated form on appeal. *See* Pl.Br. at 34–37.

This argument from the layman's definition of "termination" simply restates the necessary effects of a conversion of a defined-contribution profit-sharing plan into a defined-benefit plan, and if we accept the premise that ERISA allows the conversion of a profit-sharing plan into a defined-benefit plan, the arguments which the plaintiffs make for termination lose their force. Section 8.3 of the Former Plan provided for termination by resolution of the board of directors of Velsicol, or in the event of

Velsicol's bankruptcy or insolvency or if there were a corporate merger, consolidation, reorganization or sale of all assets. None of these events occurred. Nor do we believe that any of the applicable statutes or regulations dictate the conclusion that the Former Plan terminated in the course of the attempted conversion of the profit-sharing plan to a defined-benefit pension plan.

The plaintiffs rely on a memorandum written by Velsicol's Vice President for Personnel acknowledging "the 100% vesting" of the account balances as a result of the "legal requirements" governing the conversion. In this connection, the plaintiffs cite section 411(d)(3) of the Code, 26 U.S.C. § 411(d)(3), which requires full vesting of the rights of affected employees if a plan is terminated, § 411(d)(3)(A), or "upon complete discontinuance of contributions under the plan," § 411(d)(3)(B). We think that there was neither a termination, *see infra*, nor a complete discontinuance of contributions under the plan, as amended. Both sides agree that a form of vesting took place, but we believe that it occurred pursuant to the terms of the amendment, not by operation of law.

We do not believe that ERISA supports the contention that there was a plan termination in this case—for the same sorts of reasons that we do not believe that it gave the plaintiffs an ownership interest in the assets of the Former Plan trust. ERISA contemplates plan amendments and such transactions as plan mergers, consolidations and transfers of assets. In the context of all these, it does specifically state that a conversion from a defined-benefit to a defined-contribution plan causes a plan termination, ERISA § 4041(f), 29 U.S.C. § 1341(f); Treas.Reg. § 1.411(d)–2(c)(2). But there is no suggestion that the reverse action—conversion from defined-contribution to defined-benefit—should be treated any differently than other plan amendments.[15]

■ Generally, a plan amendment should be treated as terminating the plan if such a

---

**15.** *See* Laarman & Hildebrandt, Plan Terminations and Mergers, at A–18 (BNA Tax

Management Portfolio No. 357 (1983)):

result is indicated by "all the facts and circumstances," which include: (1) prohibited discrimination between groups of employees under the plan; (2) the exclusion of a group of previously covered employees from the plan; and (3) the creation of a potential for reversion of funds to the employer. *See* 26 U.S.C. § 411; Treas.Reg. 1.411(d)–2(c)(1); IRS Document 6678, "Plan Termination Standards" (April 1981).[16] If none of these three things have occurred, such a plan amendment will not cause a termination. Since there is no claim that a reduction in workforce or discrimination occurred, the question whether a termination occurred when the plan amendment here went into effect will depend upon whether there was a reversion, that is, whether plan assets inured to the benefit of Velsicol. This is the question we discuss next.

## IV.

The question remains whether the terms of the conversion undertaken in this case meet the requirements of ERISA and the provisions of the Former Plan itself. ERISA requires that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, . . ." 29 U.S.C. § 1054(g)(1), and the Former Plan contains a similar provision, *see* Former Plan, § 8.2.

■ The accrued benefit of a participant in a defined-contribution plan is the balance allocated to his individual account, ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B), and the defendants readily concede that they must provide the Profit Sharing Participants a minimum benefit based on the value of the accounts allocated to the various members of their class at the time of conversion. They now apparently also concede that the Profit Sharing Participants are entitled not only to the value of the profit-sharing accounts but also to interest on those accounts;[17] they have also included in the minimum benefit interest on the account

---

Thus, the amendment of a defined benefit plan into the form of a profit sharing, stock bonus, or money purchase plan would be considered a termination of the defined benefit plan, and all participants would become fully vested in their accrued benefits, under the defined benefit plan, to the extent funded. In the reverse case, however, the issue of whether there has been a complete or partial termination depends on whether the transformation resulted in discrimination, a potential for reversion of funds, or the separation from service of a number of participants formerly covered by the plan.

*See also infra* note 15.

There is good reason for ERISA to show greater concern when a defined-benefit plan is converted. Under a defined-benefit plan, (1) the employer bears the investment risk on the funds in the pension trust and (2) the assets in a defined-benefit pension trust are federally-insured by the Pension Benefit Guaranty Corporation.

16. Pre-ERISA Treasury Regulations regarding plan terminations stated that a conversion from one type of plan to another would not result in a plan termination if the original plan was replaced by a "comparable" plan. *See* Treas.Reg. § 1.401–6(b). A pension plan was comparable with another pension plan, and a profit-sharing plan with another profit-sharing plan; a pension plan and a profit-sharing plan were not deemed "comparable." Treas.Reg. § 1.381(c)11–1(d)(4). The post-ERISA Treasury

regulations with respect to plan terminations do not, however, discuss comparability, *see* Treas. Reg. § 1.414(*l*) *et seq.* The I.R.S., in Document 6678, "Plan Termination Standards," (April 1981), states that

The pre-ERISA concept of "comparable plans" as expressed in I.T.Reg. Sec. 1.381(c)(11)–1(d)(4) is not applicable in determining whether a plan that is subject to section 411(d) of the Code has been terminated or partially terminated as a result of changing one type of plan into another by amendment.

The document notes that under § 1.411(d)–2(b)(1) of the regulations, a partial termination of a defined-contribution plan may occur if the "facts and circumstances" show (1) prohibited discrimination between groups of included employees; (2) exclusion of a group of previously covered employees; and (3) the creation or increased likelihood of a reversion of fund assets to the employer. *Id.*

17. In the appendix to their reply brief defendants recite as one of plaintiffs' arguments: "Under defendants' argument regarding accrued benefits, an employer can freeze a plan and pay no interest on plan accounts." Defendants then summarize their response as follows: "Defendants do not so argue. Such a hypothetical action would reduce accrued benefits and Velsicol has never contended otherwise." App. to Reply Br. at 6a. This seems to be a change from the position which defendants took in the trial

balances compounded at 5%. We think that the defendants' concession on interest is correct; the Profit Sharing Participants are entitled to a payment of interest on their account balances under the Present Plan since the funds are not being distributed to them to invest. But we do not agree with plaintiffs' claim to the earnings actually realized by the trust and ascribable to those accounts in future years. Such a return suggests a proprietary interest in the trust accounts which is belied by the approach to conversions suggested in the Treasury Regulations, *see supra*. Further, such a rate of return seems inequitable as a part of a scheme in which Velsicol has insured the participants against falling interest rates. Plaintiffs have not suggested that, had the market not performed so well (or interest risen so high), Velsicol might have reduced the vested post-conversion profit-sharing benefit to track investment losses incurred by the Present Plan Fund.

■ Nor, however, do we think that the 5% adjustment specified in the Present Plan meets the requirements of ERISA and the Former Plan. Velsicol attempts to justify the 5% figure on the grounds that this is the rate that ERISA requires to be paid on mandatory employee contributions to defined-benefit plans, ERISA § 204(c)(2)(C), 29 U.S.C. § 1054(c)(2)(C). Velsicol also notes that the Former Plan itself provided that the Trustees of the Plan could determine how the benefits were to be distributed when the employees became entitled to them and specified that one option was a long-term installment payment, at a simple interest rate equal to the rate paid on savings accounts by the bank holding the trust assets. At the time of

conversion, that rate was subject to a maximum set by the Federal Reserve under its regulation Q, then 5%.[18]

All of this may be true but, of course, none of these provisions applies directly to account balances in profit-sharing plans which have been converted to defined-benefit plans nor addresses the possibility of a reversion caused by the conversion. The rate at which profit-sharing participants are to be compensated for the holding of their accounts beyond the time of conversion is a very sensitive determination.[19] To peg the interest rate too low is to shift the probabilities for a firm making such a conversion toward a reduced funding burden in future years. Defendant has noted the importance as a policy matter of permitting employers to convert plans in order to accommodate the company's own financial condition and serve the interests of employees. This is why ERISA allows plan amendment. But it is a different matter to permit this flexibility to become the basis for frequent changes in funding methods in an attempt to generate a windfall through conversion. Plan trustees are fiduciaries under a strict duty to deal with the funds entrusted them solely to the benefit of plan participants, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1); *see Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984). Since Velsicol has a strong financial interest in the way in which its pension plan (to which, pre- and post-conversion, it was the sole contributor) is funded, it must ensure that there is no suggestion of self-interested plan administration. It has not provided any very compelling justification under ERISA and its regulations—or in simple logic—for its 5% rate. Without such a strong justification rebutting any suggestion of self-interest,

court, where they asserted that, "If it desired, Velsicol could have provided in the Pension Plan that the minimum pension benefit would be the profit sharing balance *without adjustment*." Defendants' Memorandum in Support of Their Motion for Summary Judgment on Count III of the Complaint, at 13 (emphasis supplied).

18. Velsicol also briefly mentions that 5% is an acceptable rate because the average return on

the Former Plan assets from 1956 to 1975 had been 5.77%. We decline to embrace this justification. Past investment performance is not necessarily an accurate gauge of future performance. Further, had Velsicol meant to give a rate that mirrored the prior performance of the fund, why did it not give 5.77%?

19. No provisions of the statute or of the regulations directly address this issue.

we see no basis for biasing the economic calculation involved in choosing a pension funding regime.

■ Thus, we believe that the benefit of the doubt belongs to the Participants and that their vested benefit under the Present Plan should be calculated to include a rate of interest on the profit-sharing balances which would realistically approximate their prospects of earning interest on the account balances if the balances were in their hands over the years. We mean, of course, a going interest rate as of April 1, 1975, not a rate calculated with hindsight from the perspective of 1982 or 1985. Such a result would not create incentives for the conversion of plans following changes in the market and would ensure that the assets in the pension fund were not being used to benefit the employer. The detailed regulations that measure the validity of a merger of a defined-contribution and a defined-benefit plan are instructive in this regard because it is their purpose to prevent such a reversion in that context.[20]

As discussed *supra* Part III, when a defined-benefit and defined-contribution plan are to be merged, one plan is converted to a plan of the other type before the merger takes place. Then the plans are merged and the validity of the conversion and merger are measured by a general criterion which requires that each participant receive

> benefits on a termination basis ... from the plan immediately after the merger, consolidation, or transfer which are equal to or greater than the benefits the participant would receive on a termination basis immediately before the merger, consolidation or transfer.

Treas.Reg. 1.414(*l*)–1(a)(2)(ii). *See also* ERISA § 208, 29 U.S.C. § 1058; IRC §§ 401(a)(12), 414(*l*), 26 U.S.C. §§ 401(a)(12), 414(*l*) (substantially similar provisions). The term "benefits on a termi-

nation basis" is a defined term in the regulations, meaning "the benefits that would be provided exclusively by the plan assets pursuant to ... [ERISA] and the regulations thereunder if the plan terminated." Treas.Reg. § 1.414(*l*)–(1)(b)(5)(i).

Thus, the regulations require that before- and after-merger benefits be determined as if there had been a termination and that the post-merger value of the benefits must be at least as great as their pre-merger value. By analogy, the conversion here at issue would appear to prevent a prohibited reversion so long as the benefits on a termination basis under the Present Plan equal or exceed the benefits on a termination basis under the Former Plan.

■ Since all the assets of the Former Plan were allocated to individual accounts which would be paid to the participants if the plan were terminated, 26 U.S.C. § 411(d)(3), each participant's benefit on a termination basis immediately prior to the conversion was his or her accrued benefit, the account balance, *see* ERISA § 3(23)(B), 29 U.S.C. § 1002(23)(B). The benefit on a termination basis of the Present Plan immediately after the conversion—on April 1, 1975—was the present value (that is, the discounted value immediately after conversion) of the minimum annual benefit commencing at normal retirement age. The minimum value of the benefit starting at normal retirement age for Profit Sharing Participants under the Present Plan would be the participant's Former Plan account balance plus the specified interest plus a benefit calculated for post-conversion service. Since this calculation is based on a hypothetical plan termination immediately after conversion, there would be no post-conversion service and so no additional benefit based on that. Thus the minimum benefit at normal retirement age would be

---

**20.** We note that the regulations state that this procedure is to be used only when two plans are involved and not "merely because a defined-contribution plan is amended to become a defined-benefit plan," Treas.Reg. § 1.414(*l*)–1(c). But because the regulations were promulgated to deal with the same problem we face here, *i.e.*, to ensure that each participant retains his accrued benefit and that such value does not inure to the benefit of the employer, we find them instructive.

the account balance plus the specified interest compounded until normal retirement age, and the present value of this benefit, or the benefit on a termination basis, would be arrived at by discounting for the appropriate rate of interest prevailing at time of conversion. Thus it seems to us that ERISA would authorize a conversion such as that attempted here so long as the account balance under the Former Plan as a conversion was equalled or exceeded by the present value immediately after conversion of the participant's minimum benefit at normal retirement age, which here equals account balance plus specified interest.

The present value immediately after conversion of the minimum benefit under the Present Plan at normal retirement age equals the account balance plus the specified rate of interest (here, 5%) compounded over the period from April 1, 1975 to normal retirement age, discounted to April 1, 1975. Thus the present conversion is acceptable so long as the discounted value of the account balance plus the specified interest equals or exceeds the account value. This will be the case so long as the specified interest rate, compounded from conversion to normal retirement age,[21] equals or exceeds the discount rate for funds held for that period of time. This will, of course, approximate the long-term interest rate as of the date of conversion. Here neither party has attempted to establish

what the realizable market rate of interest was on April 1, 1975. If that rate was less than or equalled 5%, which is the specified interest rate of the Present Plan, the conversion would clearly be acceptable under ERISA. Insofar as the market rate of interest exceeded 5% on April 1, 1975, the Present Plan must provide interest on the account balances at least equal to that realizable market rate of interest in order to be an acceptable conversion under ERISA.

The concept of "benefits on a termination basis" suggests valuation of benefits *as if* there were a right to their possession immediately before or after conversion. This adjustment (which is represented by what we have called the "specified interest") is, of course, quite different from the one claimed by the plaintiffs, which is based on the actual earnings of the trust fund. Rather the adjustment reflects an *ex ante* projection of the interest which a Participant could have earned had he or she received the accrued benefits at the time of conversion. This rate must be a going rate—not an arbitrary rate prescribed for some other purpose—and since its calculation is economically crucial, it should be based on the actual circumstances of the money market as best they can be determined at the time of conversion.[22] We think that such a going rate would be fairer and more reasonable than the 5% prescribed in the Present Plan.[23]

21. We see no reason why Velsicol may not, for ease of calculation, use an appropriate actuarial figure for the class of participants instead of calculating each participant's normal retirement age, and benefits on a termination basis, separately.

22. In the ordinary case, the Trustee would have to determine the appropriate rate before undertaking the conversion and we think this process should not be overly complex or expensive. We would not want to see the Trustee have to defend against frivolous challenges to the figure he has arrived at in good faith and with due diligence. Rather we suggest that the Trustee look to comparable alternative investments, for example annuities or long-term government securities. To avoid endless haggling over tax effects and risk factors, we propose that the trustee's choice of a rate be accepted if it is based on the appropriate standard (going rate on alternative investments), is supported by sub-

stantial evidence (probably in the form of qualified expert opinion) and is not arbitrary. The 5% rate in the conversion now before us represented, *inter alia*, the interest paid on savings accounts, which have not been shown to be comparable investments for these purposes.

23. In the unlikely event it should turn out that the prescribed 5% is higher than the market rate, the plaintiffs, would, of course, be entitled to the higher rate.

Should the more likely event occur and the district court find that the relevant going rate of interest was higher than 5%, the defendants may offer evidence before the district court tending to show that the alternative benefit guaranteed by Present Plan § 6.01(b)—a defined benefit representing the employee's years of service prior to April 1, 1975—preserved the value of the plaintiffs' claims to accrued benefits.

Hence, the district court should not have granted either the defendants' motion for summary judgment or the plaintiffs' motion for partial summary judgment. The case is REVERSED AND REMANDED to the district court for a determination of a realizable fair return based upon a going interest rate that might have been earned by the participants in the profit-sharing plan had the plan been terminated and had they received the amounts in their accounts on the date of conversion, and for other proceedings not inconsistent with this opinion. Circuit Rule 18 shall not apply.