Matthew A. DELGROSSO, James P. Blair, Lester Ware, Jimmie Mines Jr., Joe Henry, Robert C. Trainer, Jay T. Richler, Robert Hardwick, Jerome J. Phillips, Gilbert Weese, Larry K. Hill, Charles G. Church Jr., John R. Alves, Barry K. Ralz, Donald Lee Adams, Charles Woodrum, Richard W. Martineau, Hubert J. Lee, Appellants,

v.

SPANG AND COMPANY, Appellee.

Matthew A. DELGROSSO, James P. Blair, Lester Ware, Jimmie Mines Jr., Joe Henry, Robert C. Trainer, Jay T. Richler, Robert Hardwick, Jerome J. Phillips, Gilbert Weese, Larry K. Hill, Charles G. Church Jr., John R. Alves, Barry K. Ralz, Donald Lee Adams, Charles Woodrum, Richard W. Martineau, Hubert J. Lee, Cross-Appellees,

v.

SPANG AND COMPANY, Cross-Appellant.

Nos. 84–3618, 84–3644.

United States Court of Appeals, Third Circuit.

Argued June 12, 1985.

Decided July 30, 1985.

As Amended Aug. 14 and Oct. 31, 1985.

See also 586 F.Supp. 177.

Daniel P. McIntyre (argued), Joy E. Klopp, Pittsburgh, Pa., for appellants-cross appellees.

Robert F. Prorok (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee-cross appellant.

Before WEIS, GARTH, and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

Matthew Delgrosso, et al, the non-vested participants [1] in the Spang pension plan (the Fund) for its Lorain, Ohio ferro slag plant, sought a ruling which would prevent Spang & Company from appropriating to itself the surplus assets of the Fund and would instead order those assets to be distributed among the non-vested participants. The district court rejected Delgrosso's claims and entered summary judgment for Spang, clearing the way for Spang & Co. to receive the surplus assets of the Fund remaining after Spang had funded all vested benefits through insurance contracts. Delgrosso appealed to this Court.

Because we conclude that Spang violated its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104 by unilaterally amending the pension plan to provide for a reversion of assets to Spang, we reverse so much of the judgment of the district court which held otherwise, and which did not provide for an allocation of the surplus funds among vested and non-vested participants.

### I.

Most of the underlying facts are undisputed. The Fund has been maintained since 1963 under a succession of collectively bargained pension agreements between

---

**1.** Throughout the opinion we will refer to the non-vested participants, the plaintiffs, as "Delgrosso."

Spang and United Steel Workers (USW). The most recent of these pension agreements was an agreement effective for the period November 1, 1980 to November 1, 1983 (the Pension Agreement). Under earlier agreements, the Fund was to be maintained as a *defined contribution* plan—that is, Spang was required to contribute $.40 per hour worked for each employee, and the employee would receive a pension in the amount of however much pension the Fund could buy once he retired.

In 1974, the plan was converted into a *defined benefit* plan, under which Spang was obligated to maintain funding for the plan at whatever level was actuarially necessary in order to provide the guaranteed benefits specified under the collective bargaining agreement. As it worked out, the earlier contributions which Spang had been required to pay into the Fund have always been adequate to fund the plan's pension obligations and Spang has made no contributions since 1974. Thus, all contributions to the Fund were contributions under a *defined contributions* plan and none were made under an actuarially based defined benefit plan.

### A.

Since 1970 all pension agreements have contained a clause unequivocally prohibiting any reversion to Spang of its contributions. This clause appears in the 1980 Pension Agreement:

12.6 The contributions made by the Company hereunder may not, under any circumstances, revert to the Company. If this Pension Plan shall terminate, the funds under the Pension Fund shall be used in the manner provided in Section 13. Without in any way limiting the foregoing, neither the Company nor any Participant hereunder nor any beneficiaries nor persons claiming through them shall have any right, title or interest in or to any of the funds in the Pension Fund, except as specifically provided in this Agreement.

Section 13 of the Pension Agreement provides priorities for funding of benefits in case of insufficient assets upon plan termination. Section 13.3 also provides:

13.3 In the event a plant is permanently shut down or a plant is relocated outside of the Georgraphical Area of its present operation, the assets of the fund established for the Pension Plan are to be allocated to each plant location in relationship to the contribution made on behalf of all Participants at such locations compared to the total Contributions made on behalf of all locations. From the funds so established, there shall be deducted:

(a) The reserves applicable to those Participants who have been transferred to other locations.

(b) Sufficient reserves to insure those persons then receiving benefits to continue to so receive them.

(c) Reserves to provide benefits for those entitled to benefits but who are not at that time receiving them.

(d) The remaining assets will be prorated among the remaining Participants in relation to each Participant's established seniority to the total seniority of all Participants for whom distribution is to be made.

For the purpose of this partial termination Section, those Participants who are on layoff and if recalled would not have a break in Continuous Service for pension purposes will be considered as active Participants for the allocation under (d) above.

Subsequent to the effective date of the 1980 Pension Agreement, but *prior* to its expiration date, several significant events occured. First, the Fund was divided into two funds, one for each of Spang's two ferro slag plants. The fund covering employees at the Chicago, Illinois plant was terminated, as operations at the location were terminated in 1979. Second, to comply with ERISA's requirement of a permanent plan document, 29 U.S.C. § 1102,[2]

**2.** 29 U.S.C. § 1102(a)(1) provides in relevant part:

Spang unilaterally drafted a new plan (the Plan). Third, Spang closed its Lorain, Ohio plant and after provision for payment of the pensions, a surplus of over $100,000 remained in the Fund. It is this surplus which has given rise to this action.

### B.

The Plan adopted by Spang incorporated two significant changes from the 1980 Pension Agreement, which was still in effect at the time Spang drew and adopted the Plan. First, the prohibition against reversion to Spang was removed, and the Plan specifically provided for reversion to Spang of Spang's earlier contributions:

> (e) To the extent there remains a surplus of assets of the trust fund after fully funding all of the above determined liabilities due to benefits payable under the Plan, such surplus shall be considered an actuarial surplus and shall be returned to the Company.

Section 12.3(e). Second, the provision that remaining assets be distributed among non-vested participants was amended to provide distribution to non-vested participants only to the extent benefits had accrued by the time of plant closing:

> (4) The remaining assets, if insufficient to provide for all remaining accrued benefits, will, if permitted by law, be prorated among the remaining Participants in relationship to each Participant's established seniority to the total seniority of all remaining Participants for whom allocation is to be made under this subparagraph (4).
>
> \* \* \* \* \* \*
>
> Such allocation shall not, however, be deemed to increase any accrued benefit nor be considered to create a benefit supplement.

§ 1102. Establishment of plan
Named fiduciaries
(a)(1) Every employee benefit plan shall be established and maintained pursuant to a written instrument....

Section 12.2. The Spang prepared Plan also allowed the Fund to finance health insurance premiums that Spang was under an independent obligation to finance on its own.

In order to support its contention that section 13.3 of the 1980 Pension Agreement was not intended to authorize a distribution of the Fund surplus to the non-vested employees, Spang filed affidavits and documents relating to the negotiating history of section 13.3. According to these documents, in 1970 USW sought ten year vesting in the pension fund. While rejecting 10 year vesting, Spang offered a provision which would result in the vesting of *all* employees upon a permanent termination of a plant location. Spang, contrary to Delgrosso's assertion, claims that this negotiating history governs the interpretation of section 13.3 of the Pension Agreement, and supports its contention that the pensions for non-vested participants, such as Delgrosso, are limited to only a fraction of full pension benefits.

### C.

Delgrosso sought neither arbitration nor retirement board review of his claims,[3] but rather filed a four count complaint in federal court. The first count alleged that Spang's refusal to allocate the entire surplus to Delgrosso violated its fiduciary duty under ERISA, 29 U.S.C. § 1104(a)(1)(D). Delgrosso therefore sought an order directing Spang to comply with section 13.3 of the 1980 Pension Agreement. He also sought damages for delay.

The second count alleged that Spang intended to appropriate the surplus upon expiration of the 1980 Pension Agreement, again in violation of ERISA, and sought, inter alia, an immediate allocation of the

3. Section 11.2 of the 1980 Pension Agreement provides for grievance and arbitration of a dispute over "any person's right to a pension or the amount of his pension."

surplus to the non-vested participants as well as the appointment of an independent administrator.

Count III alleged that the Plan promulgated by Spang violates the 1980 Pension Agreement and thus violates Spang's fiduciary duty under ERISA. This count sought reformation of the Plan and appointment of an independent administrator.

Count IV alleged a violation of the Labor Management Relations Act (LMRA) § 301(a), 29 U.S.C. § 185(a), in that Spang's unilateral amendment of the Plan violated its collective bargaining agreement. This count also sought reformation of the Plan and appointment of an independent administrator.

Spang moved to dismiss the complaint for failure to exhaust contractual remedies. The district court denied this motion, finding that on the pleadings, Delgrosso alleged statutory as well as contractual claims. Both parties then filed cross motions for summary judgment. The district court granted summary judgment to Spang on all four counts.

The district court held that Spang was entitled to the surplus monies in the Fund. It reasoned that Spang had amended its Plan to permit reversion to Spang of the Fund's surplus and that ERISA allowed such a reversion if the Plan permitted it. The district court went on to hold that since ERISA permitted a reversion of such monies to the employer, here Spang, the Plan was not required to adhere to a collectively bargained clause which forbids such a reversion. In so holding, the district court rejected Delgrosso's claim to the surplus. It found the contract clause (section 13.3 of the Pension Agreement) ambiguous, and it interpreted the expressions of bargaining intent to require only that non-vested participants receive pensions pro-rated for their actual years of service. This interpretation of the contractual provisions was found to bar Delgrosso's LMRA claims for breach of a labor contract as well. Additionally, the district court found that plaintiffs' LMRA claims were contractual, not statutory, and thus could not be assert-

ed absent exhaustion of contractual remedies and an allegation of USW's breach of the duty of fair representation.

## II.

Initially, we must address Spang's contention that all of Delgrosso's claims, including the ERISA claims, are barred for failure to exhaust the arbitration remedy provided by the collective bargaining agreement. As we have observed, see note 3, supra, the Pension Agreement provided for arbitration.

This court has recently reaffirmed the national policy in favor of arbitration of labor disputes, and held that this policy applies equally to claims brought under ERISA as to those brought under the LMRA. *Barrowclough v. Kidder, Peabody & Co., Inc.*, 752 F.2d 923 (3d Cir. 1985). In *Barrowclough*, we noted the tension between the labor policy favoring arbitration and ERISA's policy of providing a federal forum for pension claimants. See also *Adams v. Gould, Inc.*, 687 F.2d 27 (3d Cir.1982), *cert. denied* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 348 (1983). We drew a distinction in *Barrowclough* between claims based on pension rights created by contract, which must be arbitrated, and claims based on purely statutory rights created by ERISA, which may be asserted in federal court directly. See also *Viggiano v. Shenango China Division of Anchor Hocking Corporation*, 750 F.2d 276 (3d Cir.1984). The claims asserted by Delgrosso in this case fall between these two categories; while Delgrosso asserts a breach of ERISA's statutory fiduciary duties by Spang, the essence of the alleged breach of fiduciary duty is a failure to abide by the terms of the Pension Agreement. Spang's compliance with ERISA thus depends on a construction of the Pension Agreement.

██ We need not decide whether the exhaustion of arbitral remedies requirement generally applicable to labor agreement claims applies to bar the Delgrosso's claims in this case, however, if these claims are

not within the ambit of the Pension Agreement's arbitration clause. It is an elementary principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960).

While we are not unmindful of the principle that labor arbitration clauses are to be construed broadly, see *Barrowclough,* 752 F.2d at 938, we do not find that the arbitration clause in the Pension Agreement can be expanded to include the type of claims asserted by Delgrosso in this case. Unlike the broad arbitration clause at issue in *Barrowclough,* which covered "all disputes arising out of employment or the termination ... of employment," the Pension Agreement clause covers only "any difference [that arises] ... as to any person's right to a pension or the amount of his pension." [4]

■ In this case, Delgrosso does not seek to establish his right to a pension; nor does he seek an increased pension. Rather, he claims that in winding up the business of the Fund, the company must distribute leftover assets in a particular way; that is, according to Delgrosso, the Fund may not distribute any assets to the company, and the Fund must distribute excess assets in accordance with the Pension Agreement. These claims, relating to the distribution of excess Fund assets, can by no stretch of language be considered a "difference ... as to any person's right to a pension or the amount of his pension."

Because the reach of the arbitration clause cannot encompass the claims made by Delgrosso, Delgrosso cannot be compelled to exhaust contractual arbitration remedies under the Pension Agreement and Delgrosso may properly seek relief in the federal courts. [5] *See Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984); *Anderson v. Alpha Portland Industries, Inc.,* 752 F.2d 1293 (8th Cir.1985); *Cf. Murphy v. Heppenstall Co.,* 635 F.2d 233 (3d Cir. 1980) (arbitration of disputes as to the "right to a pension or the amount of ... pension" doesn't cover dispute over company's liability to fund benefits.)

### III.

We turn to the validity of Delgrosso's two challenges to the Plan document as drawn by Spang. First, Delgrosso contends that the Plan provision allowing reversion of excess assets to Spang violates section 12.6 [6] of the Pension Agreement. Second, Delgrosso contends that the Plan provision for pro-rated pensions upon termination for non-vested participants vio-

---

**4.** The Pension Agreement arbitration clause provides in sections 11.1 and 11.2:

.SECTION 11.—ADMINISTRATION AND APPEALS PROCEDURE

11.1 The administration of the pension benefits shall be in the charge of the Company.

11.2 If any difference (other than one arising under Section 6.5) shall arise between the Company and any Employee, Participant, the Union or any person claiming rights hereunder as to any person's right to a pension or the amount of his pension and agreement cannot be reached between the Company and a representative of the Union, such question shall be referred to an arbitrator to be selected by the Company and the Union in the manner provided in the Basic Agreement for the selection of arbitrators in the settlement of grievances. The arbitrator shall have authority only to decide the question pursuant to the provisions of this Agreement applicable to the question, but he shall not have authority in any way to alter, add to or subtract from any of such provisions. The decision of the arbitrator on any such question shall be binding on the Company, the Union, the Participant, and the person who asserted the claim. The fees and expenses of the arbitrator shall be shared equally by the Company and the Union.

**5.** Because we find the Delgrosso's claims to be without the scope of the arbitration clause, we need not address his further argument that Spang's failure to include the arbitration remedy in its Plan description booklets, bars Spang from relying on the arbitration clause.

**6.** The relevant portion of section 12.6 provides: "The contributions made by the Company hereunder may not, under any circumstances, revert to the Company."

lates section 13.3 of the Pension Agreement, which allocates all remaining assets to the "remaining participants."[7] Resolution of these issues requires application of the statutory requirements of ERISA as well as principles of contract interpretation.

### A.

ERISA creates a fiduciary duty on the part of an employer administering a plan. 29 U.S.C. § 1104 provides:

### § 1104. Fiduciary duties

(a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

\* \* \* \* \* \*

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.

Delgrosso claims that the Pension Agreement is an "instrument governing the plan" and that Spang breached its section 1104(a)(1)(D) duty to administer the Fund in accordance with the Pension Agreement, because the Agreement affirmatively bars reversion to the employer. Despite this bar, Spang nevertheless promulgated a plan which provided for reversion to it. Further, Delgrosso points to the prohibited transactions provisions of ERISA, which specifically prohibit the transfer of plan assets to a "party in interest", including the employer. 29 U.S.C. § 1106(a)(1)(D).

Spang counters by referring to ERISA section 1344, which allows such reversion under certain circumstances:

**Distribution of residual assets; remaining assets**

(d)(1) Any residual assets of a plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied.

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

Spang claims that in this case it has satisfied all the criteria under section 1344 and is therefore entitled to a reversion of the surplus. Resolution of this issue then turns on whether the section 1344(d)(1) requirement, that the plan provides for distribution to the employer, is met by a plan provision unilaterally drafted by the employer, and which is inconsistent with the underlying Pension Agreement.

Spang draws our attention to two cases allowing reversion to an employer under similar circumstances, *Washington Baltimore Newspaper Guild v. Washington Star Co.,* 555 F.Supp. 257 (D.D.C.1983), *aff'd without opinion* 729 F.2d 863 (D.C. Cir.1984); and *In Re C.D. Moyer Trust Fund,* 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd without opinion,* 582 F.2d 1273 (3d Cir.1978). In *C.D. Moyer,* an original plan provision in a defined benefit plan authorized the employer to alter or amend the pension agreement, providing that in no case should "any of the trust corpus or income be diverted to or revert to" the employer. Despite this provision, the employer amended the plan to provide that "any assets which remain in the Plan because of erroneous actuarial computations after the Plan has satisfied all its liabilities shall be returned to the employer." The district court upheld this amendment despite the restrictive language of the original plan, reasoning that "trust corpus or income" included "only so much of the funds as were necessary to insure full payment of the plan's obligations to participants." 441 F.Supp. at 1132. The court further reasoned:

---

**7.** See text, supra, for the full text of section 13.3.

Having determined that the amendment is valid, it follows that a refund to the employer meets the requirements of section 4044(d)(1) of ERISA.

This result is consistent with the policies underlying the enactment of ERISA. Employers will continue to fund their plans under ERISA guidelines, but will not be penalized for overfunding in "an abundance of caution" or as a result of a miscalculation on the part of an actuary. Thus, employees will continue to be protected to the extent of their specific benefits, but will not receive any windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis.

441 F.Supp. at 1132–33.

In *Washington Star*, the original plan authorized the employer to amend the plan so long as no amendment diverted "any part of" the trust fund to a purpose other than the exclusive benefit of the employees. The original termination provision provided that "In no event shall any of the trust fund be ... returned to the employer." The employer subsequently amended the termination provisions to provide that "any assets remaining in the trust Fund after the full satisfaction of all liabilities of the Plan to participants and their beneficiaries shall be returned to the employer." The district court found this amendment to be authorized and effective, reasoning that the "exclusive benefit" language of the amendment authorization adopted not only the fiduciary rule of ERISA, but the § 1344(d)(1) exception to that rule, allowing reversion to the employer, as well. Since the termination provision was effectively amended to allow reversion, such a return of monies to the employer was held not to violate ERISA. The *Washington Star* district court also relied on the *C.D. Moyer* opinion's statement of the policy in favor of returning to the employer contributions in excess of those actuarially necessary to provide the defined benefits.

Even if we were inclined to follow the reasoning of *C.D. Moyer* and *Washington Star*, and we are not persuaded that we should, neither case would require that the surplus assets should revert to Spang. Both cases are factually distinguishable because, unlike *Moyer* and *Washington Star*, the contributions made to the Spang Fund were all made pursuant to a defined *contribution* agreement. Unlike the employers in *Moyer* and *Washington Star*, who paid more into the funds than ultimately proved necessary and who then sought refunds of over payments, Spang here seeks the return of those monies which it was contractually required to pay into the Fund as deferred compensation for its employees. No "overabundance of caution" is involved in this case. Indeed, neither *Moyer* nor *Washington Star* is helpful here because the provision of the Pension Agreement prohibiting reversion, unlike the anti-version clauses in those cases, is simply not susceptible to a restrictive interpretation.

Unlike the plans in *Moyer* and *Washington Star*, Spang has never been given any authority to amend the Pension Agreement.[8] The reasoning underlying the *Moyer* and *Washington Star* cases hinged on a finding that the plans in those cases were effectively amended to allow reversion of plan assets to the employer. Here, the Pension Agreement makes no provision for amendment by Spang and precludes any change in terms during the duration of the Agreement. Under section 1104(a)(1)(D), the company (Spang) must administer the plan according to plan documents, which here includes the Pension Agreement. Since the Pension Agreement specifically provides that "[t]he contributions made by the Company hereunder may not, under any circumstances, revert to the Company," Spang failed to comply with the relevant plan documents.

Thus, any plan provision permitting reversion of Plan assets to Spang is not "in

---

**8.** Spang claims that it became obligated to draft a permanent plan by ERISA § 1102. While 29 U.S.C. § 1102 does so require, § 1102 does not authorize Spang to deviate from the terms of the Pension Agreement. See note 2 supra.

accordance with the documents and instruments governing the plan" under ERISA section 1104(a)(1)(D), and any Plan provision so providing is ineffective.[9] It follows that Spang breached its fiduciary duty by failing to administer the Plan in accordance with the governing documents, i.e., the Pension Agreement.

### B.

■ Delgrosso also contends that the Plan provision granting limited pro-rated pensions to non-vested participants violates the Pension Agreement. The Pension Agreement provides that, upon plant termination and after funding all vested obligations of the plan, "the remaining assets will be pro-rated among the remaining participants." Delgrosso therefore seeks reformation of the Plan to provide for distribution of all surplus assets to the non-vested participants.[10]

The construction to be given section 13.3 is highly problematic. On the one hand, the literal language provides: "the remaining assets will be pro-rated among the remaining participants." On the other hand, such a literal application would lead to absurd results: employees with just a few years of service would receive pensions several times greater than the pensions of employees with thirty years of service. In the context of a defined benefit plan (such as the Spang plan had become), such a residuary clause would create a potential windfall for the non-vested participants. Therein lies the problem: when section 13.3 was drafted in 1970, benefits were to be paid according to *contributions* made on behalf of each employee. Each vested employee would receive a share of the total assets of the Fund based on contributions

made on his behalf, leaving in the Fund only those assets attributable to contributions made on behalf of other participants. Under the likely expectations of the parties at the time of drafting section 13.3, the remaining assets would be nominal, and could be attributed directly to employer contributions made on behalf of those employees whose pensions had not yet vested as of a plant termination.

Thus, the existence of a large surplus, sufficient to fund vested benefits of a *defined benefit* plan several times over, was undoubtedly a situation not within the contemplation of the Pension Agreement as drafted. In such a situation characterized by Professor Farnsworth as an "omitted case," that is, a contingency not contemplated by the contract, a court may look to the expectations of the parties in order to interpret the agreement to deal with the unanticipated event. See E. Farnsworth, *Contracts* § 7.15–.16 (1982). According to Professor Farnsworth:

> In interpreting the agreement, the court will also consider the foreseeability of the situation. If the court is convinced that the parties could not have foreseen it, and therefore could not have intended their agreement to cover it, the court may refuse to apply the contract language, despite its apparent applicability, and may find that the case before it is an omitted one. This result is particularly likely under long-term contracts, where unforeseeability is endemic.

Id. at 522.

On the record before us, the only evidence of the parties' expectations in 1970 is a letter Forsling wrote to Newell, proposing a clause that would grant non-vested

---

**9.** We cannot accept the district court's reliance on the second clause of 29 U.S.C. § 1104(a)(1)(D) which adds the qualification "insofar as such documents and instruments are consistent with the provisions of this subchapter." The district court reasoned that the reversion prohibition in the Pension Agreement was "inconsistent" with 29 U.S.C. § 1344(d), which permits reversion *if the plan document so provides.* We cannot agree that a provision in an agreement which prohibits reversion is inconsistent with a statutory provision which permits reversion so long as no contractual provision

prohibits it. If anything, § 1344(d) contemplates precisely the opposite result than that reached by the district court.

**10.** Spang also argues that Delgrosso may make no claim under section 13.3 until the Plan is actually terminated, citing *Van Orman v. American Insurance Company,* 680 F.2d 301 (3d Cir. 1982). By its terms, however, section 13.3 is triggered upon *plant* termination, an event which has already occurred.

employees deferred pro-rated pensions upon plant termination. Forsling testified at deposition that this language reflected his understanding that the Pension Agreement would provide for deferred pro-rated pensions to non-vested participants in the case of plant shutdown. William T. Marsh, Vice President of Spang, stated by affidavit that section 13.3 was the result of the Union's desire for earlier vesting, to which the company responded by proposing immediate vesting upon plant termination. According to Marsh:

> At no time during the negotiation of any of the pension agreements recited above, i.e., from 1963 through 1980, did the Union ever propose that the pension benefits of law seniority employees be better than the pension benefits of higher seniority employees.

Affidavit of William T. Marsh dated October 10, 1983 at p. 7.

Delgrosso submitted no affidavit or evidence that would contradict the understanding of the Pension Agreement reflected by Marsh's affidavit and Forsling's testimony, to the effect that non-vested participants were to receive no greater benefits than vested participants, with greater seniority. We thus conclude that the distribution scheme envisaged by section 12.2 of Spang's Plan (See Part IB *supra*) more nearly reflects the expectations of the parties when section 13.3 was originally drafted, than does the interpretation of section 13.3 advocated by Delgrosso.[11]

## IV.

Having concluded that Spang breached its fiduciary duty by implementing a Plan provision providing for reversion of Fund assets to itself in violation of the Pension Agreement, we must determine what relief appropriately may be granted to Delgrosso under ERISA and the LMRA. In this connection, we note that plaintiffs' complaint

sought, inter alia, reformation of the Plan document and appointment of an independent administrator.

Section 1109(a) of ERISA provides specifically that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter ... shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

Section 1132(a) further provides that:

**§ 1132. Civil enforcement**

**Persons empowered to bring civil action**

(a) A civil action may be brought—

> \* \* \* \* \* \*

> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

■ A federal court enforcing fiduciary obligations under ERISA is thus given broad equitable powers to implement its remedial decrees. Removal and replacement of a fund administrator under ERISA has been found appropriate where the administrator has been in substantial violation of his fiduciary duties. *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.), *cert. denied* —— U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Similarly, reformation of a labor document to reflect accurately the intent of the negotiating parties has

---

11. Apparently, Delgrosso contemplated a division of the surplus among vested and non-vested participants in the event that Spang was denied the surplus. In its brief, Delgrosso stated:

> Appellants believe that an administrator with no financial interest in the fund would,

upon the Court's reformation of the Company's plan, distribute the excess assets in the fund equitably to Appellants and/or other participants.

Brief for Delgrosso at 42 n. 25.

been held to be an appropriate remedy under section 301(a) of the LMRA, 29 U.S.C. § 185(a). *West Coast Telephone Co. v. Local Union No. 77, I.B.E.W.*, 431 F.2d 1219 (9th Cir.1970). See also *H. Prang Trucking Co. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3d Cir.1980).

 Since there is not the slightest ambiguity in the anti-reversion clause of the Pension Agreement, it is clear that reformation of the Spang Plan to bar reversion is appropriate. It is also evident from our discussion above that Spang committed a substantial breach of its fiduciary duty to the Fund participants by fashioning a Plan which, contrary to the express terms of the Pension Agreement agreed to by the parties, would result in a reversion of the Fund assets to Spang rather than to the participants in the Fund for whose "exclusive benefit" the Fund must be managed. Since the Fund must now determine how to dispose of these excess assets, it is essential that an independent administrator be appointed to determine whether to terminate the Plan,[12] and to allocate the surplus assets among the appropriate participants. In light of the position taken by Spang in these proceedings, it is clear that Spang may not be charged with that task.

We note that ERISA specifically provides that the administrator perform the allocation of Fund assets upon termination. 29 U.S.C. § 1344(a). We also observe that Labor Regulations provide specifically for the allocation to be performed upon termination of a plan that does not allow reversion of plan assets to the employer, as this one does not. These regulations provide for allocation according to the ratio of each participant's accrued benefits to the sum of all accrued benefits. 29 C.F.R. § 2628.-32(a). Since this allocation would result in an increase in benefits payable to the vested, as well as the non-vested employees, the district court should appoint a representative for the vested participants to represent their interests in the selection of an independent administrator.

V.

We will affirm the entry of summary judgment on Counts I and II in favor of Spang because these counts essentially sought to have all surplus assets distributed to the non-vested participants such as Delgrosso. We have held in this opinion that the surplus assets may not revert to Spang nor are they available exclusively to Delgrosso. Thus the district court's rejection of these counts of Delgrosso's complaint is well taken.

Because we find that Spang could not implement a Plan which allows reversion of Fund assets to itself, and because we find that by doing so Spang breached its fiduciary duty under ERISA, we will reverse so much of the district court's order of August 29, 1984 as granted judgment to Spang on Counts III and IV and we will remand this case with the following directions. The district court, consistent with the foregoing opinion, is directed to: 1) grant summary judgment in favor of Delgrosso on Counts III and IV[13] 2) re-

---

**12.** Spang contends in a supplemental letter brief that an independent administrator may not decide to terminate the plan, relying on a provision in the Spang Plan (section 12.1) to the effect that "The Company shall have the sole and absolute right to terminate the Plan." We note, however, that ERISA authorizes the plan administrator to terminate a plan. 29 U.S.C. § 1341(a); see Employment Coordinator (RIA) ¶ B–21, 120 (1985). An independent administrator thus need not follow an inconsistent plan provision to the contrary. 29 U.S.C. § 1104(a)(1)(D). Nor does the administrator's authority to terminate unduly hamper the employer's freedom to decide whether or not to maintain a plan; nothing prevents the employer from terminating the plan if it desires to cease maintaining a plan or from creating a new plan if it desires to maintain a plan. In the circumstances of this case, where all plant locations covered by the plan have been closed, Spang's contention that it might wish to continue to maintain the plan is disingenuous.

**13.** Count IV stated a cause of action under the Labor Management Relations Act § 301(a), 29 U.S.C. § 185(a). The district court entered judgment in favor of Spang based on Delgrosso's failure to exhaust contractual remedies, i.e., to arbitrate his claim. Since we have held that these claims were not within the arbitration clause of the Pension Agreement, see Part II, supra, summary judgment must be reversed. Delgrosso seeks no different relief under Count

form the Spang Plan to provide that reversion to Spang of the Fund surplus is barred; 3) appoint a representative for the vested participants to represent them in the selection of an independent Plan administrator; and 4) under appropriate procedures, appoint an independent administrator of the Plan in the place of Spang.

---

IV than he does under Count III, however, and having resolved in favor of Delgrosso the ERISA claims for reformation and appointment of an administrator, no other relief is available under Count IV.

