Edward C. FECHTER, Evelyn Hoffman, Roderick M. Jackson, individually and on behalf of all others similarly situated, Appellees,

v.

HMW INDUSTRIES, INC., Clabir Corporation, Hamilton Technology, Inc., Henry D. Clarke, Jr., Kenneth R. Bernhardt and Gloria G. Strantz.

No. 89–1249.

United States Court of Appeals, Third Circuit.

Argued May 18, 1989.

Decided June 29, 1989.

Marc J. Sonnenfeld, (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., Robert J. Jossen, (argued), Joseph F. Donley, Nina D. Ruffini, Shereff, Friedman, Hoffman & Goodman, New York City, Jon W. Tryon, Gary D. Melchionni, Tyron, Friedman & Espenshade, Lancaster, Pa., for appellants.

Joseph A. Bubba (argued), Andrew W. Markley, Fitzpatrick, Lentz & Bubba, Allentown, Pa., Richard F. Stevens, Butz, Hudders, Tallman, Stevens, & Johnson, Allentown, Pa., for appellees.

Before GIBBONS, Chief Judge, and MANSMANN and ALDISERT, Circuit Judges.

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this ERISA[1] case we are faced with the question of whether the district court properly issued a preliminary injunction against corporate and individual defendants prohibiting them from transferring, selling or in any way dissipating their property except in the ordinary course of business pending the final outcome of a lawsuit in which pension plan participants seek the return of a portion of the distribution of excess assets from the termination of the plan. Because we found the injunction against the personal assets of the individual defendants to be improper, we vacated it by order dated May 18, 1989. In addition, because corporate defendant Hamilton Technology has satisfied its liability to the pension plan as determined by the Pension Benefit Guaranty Corporation and since it is not the plan administrator, we will vacate the preliminary injunction against it.

As to the remaining two corporate defendants (Clabir Corporation, HMW Industries, Inc.) however, we will uphold the district court's issuance of the preliminary injunction because the plaintiffs demonstrated a reasonable likelihood of success on the merits of Count II of the complaint, demonstrated an irreparable harm through the possible loss of a statutorily guaranteed cause of action and the equities balanced in their favor.

I.

Edward C. Fechter represents the plaintiffs, a certified class consisting of approximately 650 current and former employees of the Hamilton Watch Co., HMW Industries Inc., and Hamilton Technology, who participated in the HMW Pension Plan. The defendants consist of three corporate defendants: Clabir Corporation, Hamilton Technology, Inc. (HamTech), and HMW Industries, Inc. (HMW), as well as three individual defendants: Gloria Strantz, former manager of benefits at HMW Industries, Henry D. Clarke, president of Clabir Corporation, and Kenneth R. Bernhardt, president of HamTech. Fechter brought suit after the HMW Plan, which was terminated in March 1984,[2] was distributed mostly to the employer HMW to the detriment of the plan participants allegedly in violation of several ERISA sections.

The HMW Plan was an employee contribution plan where each participating employee paid between 2% and 4% of his salary to the Fund. Employer contributions were made only when necessary to keep the Fund actuarially sound, i.e., sufficiently funded. Because the Plan was overfunded, HMW did not have to make any contributions for the last five plan years. After termination of the Plan, Connecticut General Life Ins. Co. ("CG"), with whom

---

1. Employees Retirement Income Security Act, Pub.L. 93–406, Title I, § 2, 88 Stat. 832 (1974) codified at 29 U.S.C.A. § 1001 et seq. (West 1985).

2. HMW Industries originally consisted of three divisions: Hamilton Technology (HamTech), Wallace Silversmiths, Inc., (Wallace) and Hamilton Precision Metals (Metals). In August 1983, HMW Industries sold Wallace and Metals to Katy Industries. In October, 1983, the controlling interest of HMW Industries and its remaining subsidiary, HamTech, was acquired by the Clabir Corporation. The board of directors of Clabir Corporation decided to terminate the Plan in January, 1984 to be effective March, 1984, pending IRS and Pension Benefit Guaranty Corporation (PBGC) approvals.

HMW had a contract for investment purposes of the Fund, calculated the surplus of assets over liabilities to be over $9 million. After approval of the termination by the Pension Benefit Guarantee Corporation ("PBGC"), CG calculated the distribution of the surplus and determined that the 650 employee participants would share in 17% of the surplus while HMW, and its parent corporation Clabir, would recover 83% of the surplus.

Count I of the complaint alleged that HMW violated 29 U.S.C.A. § 1344(d)(1) which prohibits the reversion of surplus assets to an employer where the plan language does not provide for such a reversion.[3] In addition, Count I alleged that the individual defendants breached their fiduciary duty by failing to act solely for the benefit of plan participants in violation of 29 U.S.C.A. § 1104.

Fechter alleged in Count II of the complaint that HMW's inclusion of retirees in the formula to distribute surplus assets was a violation of ERISA, specifically of 29 U.S.C.A. § 1344(d)(3)(B)(ii). The method CG used to determine the percentage of surplus distributed to the participants was to multiply the $9 million surplus by a fraction which consisted of a numerator composed of (a), the total contributions by plan participants, and the denominator composed of that number (a) and (b), the cost of benefits to be purchased upon termination, and (c) the cost of retirees benefits:

$$\frac{\text{(a) } \$2,954,025}{\text{(a) } \$2,954,025 + \text{(b) } 2,815,314 + \text{(c) } 11,653,007} = 17\%$$

Thus, $1.7 million was distributed to Fechter, *et al.*

Under the pre–ERISA HMW Plan, when an individual chose to retire, the benefits allocated to him as a result of both his and HMW's contributions (plus interest) were transferred to a trust—known as the Retired Lives Account—for the purchase of individual annuities which guaranteed the retiree's monthly pension. These "irrevocable commitments," as Fechter refers to them, essentially resulted in a lessening of liability of the Fund because, once bought and paid for, the Fund no longer had to guarantee the individual's benefits. Instead, the annuity contract with CG did so. It is apparent that both pre- and post–ERISA contracts between CG and HMW provided for the purchase of annuities.[4] Fechter contends that if the (c) figure for retiree liability is removed from the formula for the distribution of assets, the percentage changes:

$$\frac{\text{(a) } \$2,954,025}{\text{(a) } \$2,954,025 + \text{(b) } \$2,815,314} = 54.6\%$$

Under the proposed calculation, $5,254,391 would be distributed to Fechter, *et al.*

Counts III and IV dealt with allegations that the defendants had denied participants' benefits by failing to include in the distribution to them the yield on investments and benefits promised but not yet accrued.

Fechter brought the underlying lawsuit in January of 1987 and then sought a preliminary injunction to prohibit the further dissipation of surplus plan assets, to order an accounting to determine how much of the assets had been dissipated, to establish

---

**3.** Specifically, the section reads:

(d) Distribution of residual assets; remaining assets

(1) Any residual assets of a single employer plan may be distributed to the employer *if—*

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied

(B) the distribution does not contravene any provision of law, and

(C) *the plan provides for such a distribution in these circumstances.*

29 U.S.C.A. § 1344(d)(1) (Emphasis added).

**4.** The contract between CG and HMW, drafted to meet ERISA requirements when the statute was enacted, contained the following language:

PREMIUMS FOR RETIREMENT ANNUITY. 1. As of the Annuity Commencement Date of a Participant or other payee, the Insurance Company will withdraw from the Deposit Administration Fund a premium for the Retirement Annuity *which is to be credited to him* in accordance with Part 4. This premium shall be equal to the yearly amount of such Retirement Annuity as multiplied by the appropriate rate from TABLE A–3. *Upon such withdrawal, the premium will be applied to purchase the Retirement Annuity.*

(Emphasis added.)

a constructive trust of the assets and to order the defendants to post a bond in the amount of the surplus assets. Fechter alleged that certain actions by the defendant corporations, HMW and Clabir, gave rise to doubts that there would be any assets to satisfy the judgment if Fechter was successful. In December, 1988, Clabir, HMW and a third subsidiary of Clabir, sold the parent corporation of HamTech—General Defense Corporation—to the Olin Corporation. The proceeds of the sale were used to reduce the corporate indebtedness of Clabir. The assets held by HMW at that time were $28.4 million, consisting mostly of accounts receivable owed to HMW by Clabir. The surplus monies distributed to HMW from the Plan were "advanced" to Clabir. The district court found that these funds were not separately accounted for or segregated.

The district court granted Fechter's motion for a preliminary injunction and prohibited all defendants, both corporate and individual, from "transferring, conveying, disposing, selling, encumbering or in any manner dissipating any real or personal property except as necessary in the ordinary course of business without prior approval of the court." The district court also provided that the injunction would be released against any party who proves that it has set aside funds in an amount equal to the excess assets taken from the HMW Plan, including interest.

All defendants appeal from the issuance of the injunction. The grant or denial of a preliminary injunction is left to the discretion of the district court. Consequently, we review the decision only to see if the district court abused its discretion or committed an error in applying the law. *Kershner v. Mazurkiewicz,* 670 F.2d 440 (3d Cir.1982).

## II.

■ HMW contends that the district court erred in granting the preliminary injunction for two main reasons: (1) that plaintiffs will not succeed on the merits and (2) since the plaintiffs are alleging only monetary damage, issuance of an injunction is improper.[5] In addition, HMW argues that issuance of the injunction against the individuals Strantz, Clarke and Bernhardt is improper since Fechter cannot show liability on their part. Strantz, since retired, was the Benefits Manager of the HMW Plan at the time of the termination; Clarke is the President and CEO of Clabir; and, Bernhardt is the President and CEO of HamTech. We have concluded that an injunction against the personal assets of the three individual defendants is improper since there is no reasonable likelihood of success on the merits against them in their individual capacity. Indeed, the district court made no findings which would support the issuance of an injunction against the individual defendants. Therefore, an injunction against their personal assets should not lie. Consequently, we vacated the injunction as to the individual defendants.

■ At oral argument, counsel for HamTech argued that HamTech should be relieved from the burden of the preliminary injunction because: (1) HamTech received no assets from the distribution of the surplus, and, (2) HamTech is not a fiduciary under the HMW Plan. After considering these contentions, we agree. The Plan document identifies HMW Industries, Inc. as the Plan Administrator and the intent of the plan sponsors was clearly to hold HMW Industries, Inc. to the role of plan fiduciary. We also note that because the Plan was fully funded at the time of termination, the PBGC found no liability on the part of HamTech as an employer. Nor is there any record of evidence that HamTech received any of the Plan surplus. Since HamTech is now owned by the Olin Corporation, it has no further relationship with either HMW Industries, Inc. or Clabir. We will vacate the preliminary injunction as to HamTech. However, as to the two remaining corporate defendants, HMW Industries,

---

**5.** The defendants also argue that the Rule 65 injunction motion was really an attempt to circumvent Rule 64 (dealing with pre-judgment freeze orders) since the plaintiffs could not satisfy the requirements. Due to our decision we do not need to address this issue.

Inc. and Clabir, we must conduct an analysis to determine whether the district court properly issued an injunction *pendente lite.*

The standard by which a preliminary injunction will issue is well settled: the court must consider the moving party's likelihood of success on the merits, the probability of irreparable injury to the moving party in the absence of relief, the potential harm to the non-moving party, and if applicable, the public interest. *See United States v. Price,* 688 F.2d 204, 211 (3d Cir.1982). Since we note that the district court used the proper standard, our review centers on whether the court properly applied the law to the facts of the case.

### III.

To determine whether the moving party, Fechter, had a reasonable likelihood of success on the merits, the district court viewed the counts in the complaint in light of the applicable law—in this case, ERISA, 29 U.S.C.A. § 1001 *et seq.* In count I Fechter alleged that by the terms of the pre–ERISA plan the reversion of any surplus assets to the employer was prohibited. Count II alleged that the distribution of the surplus was performed in violation of the ERISA provisions governing the allocation of surplus funds. *See* 29 U.S.C.A. § 1344(d)(1).[6]

### A.

■ Fechter alleges in Count I that under the pre–ERISA provisions of the Plan, HMW did not have the right to distribute any of the surplus assets to itself. Therefore any distribution to HMW violated 29 U.S.C.A. § 1344(d)(1)(C). In support of this argument Fechter quotes the pre–ERISA pension plan handbooks which state in pertinent part:

> In the event the Plan is discontinued, Company contributions made on and after January 1, 1964 will be allocated among the active participants and *no contributions will revert to the Company* except to the extent that aggregate

Company contributions are in excess of the Company's liability under the Plan. (Emphasis added).

HMW counters by stating that § 16.11 of the 1976 amendment to the Plan, which amendment was designed to bring the Plan into compliance with the newly passed ERISA statute, provides for the reversion of surplus assets to the fund. In rejecting this argument the district court relied on our decision in *Delgrosso v. Spang & Co.,* 769 F.2d 928 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986).

*Delgrosso* involved a pension plan ("Fund") maintained pursuant to a collective bargaining agreement beginning in 1963. For the period 1963–1974 the Fund was a defined contribution plan; *i.e.,* Spang was required by the collective bargaining agreement to contribute a set rate per hour for each employee and the employee received a pension in the amount of an annuity which the Fund could afford to buy based on the contributions. *Delgrosso,* 769 F.2d at 930. In this respect, that Fund was similar to the HMW Plan which would, upon retirement, purchase annuities of irrevocable commitments for each retiree. In 1974 the Fund was converted to a *defined benefit* plan under which Spang was required to make contributions for the sole purpose of maintaining the Fund so it could provide the benefits guaranteed under the collective bargaining agreement. Spang found it unnecessary to make contributions after 1974 because the Fund was fully funded by its earlier contributions. *Delgrosso,* 769 F.2d at 930. Between the effective date and the expiration date of the 1980 agreement, Spang unilaterally amended the Fund document—ostensibly to comply with ERISA's requirement of a formal document—and removed the prohibition against reversion to Spang, including contributions from the earlier defined contribution plan. In addition, the provision allowing for distribution of assets to non-

---

6. The district court did not address Counts III and IV in its preliminary injunction analysis. We find it unnecessary to discuss these counts in light of our decision.

vested participants [7] was amended to allow distribution only in event of a plant closing. In holding that the unilateral amendment to the Fund document was impermissible, we noted that the document's language did not provide for a unilateral amendment by Spang. *Delgrosso*, 769 F.2d at 935.

Here, HMW's 1976 amendment provided for a reversion "after the assets of the Fund have been withdrawn and allocated in accordance with the preceding terms of this section, any amount remaining in the Fund will be returned to the Employer." (App. at 173.) This boilerplate language was the result of the adoption of a form pension plan provided by CG in order for the HMW Plan to comply with ERISA. Prior to the addition of this language, the HMW Plan handbook specifically stated that "no contributions will revert to the Company except to the extent that aggregate Company contributions are in excess of the Company's liability under the Plan."

The facts of *Delgrosso* are not sufficiently similar to the facts now before us for *Delgrosso* to control. We are not dealing here with a unilateral amendment; rather, we are dealing with the plain language in earlier documents which allows the employer to receive a reversion of contributions to the extent that the employer's contributions exceed liability. This language was amended in 1976 to comply with ERISA, thereby providing that the allocation of

funds upon termination would be made according to 29 U.S.C.A. § 1344 which permits a distribution of the surplus to the employer if the plan document so provides. *See* 29 U.S.C.A. § 1344(d)(1). Consequently, we find that HMW was entitled to a portion of the surplus assets distributed upon termination of the Plan. *See also Chait v. Bernstein*, 835 F.2d 1017 (3d Cir. 1987) ("exclusive benefit" language of ERISA, standing alone, is insufficient to prevent surplus assets from reverting to employer).

We conclude that the district court improperly relied on the holding in *Delgrosso v. Spang & Co.* to determine that Fechter had demonstrated a reasonable likelihood of success on the merits in Count I dealing with the prohibition of a reversion.

## B.

In Count II, Fechter alleged that HMW exaggerated the liabilities of the Fund by including in the formula the benefits of retirees which were already funded by "irrevocable commitments" of annuities. Fechter contends that this resulted in a skewed allocation formula which allotted more surplus to HMW.

The distribution of surplus assets at the time of the distribution of the HMW Plan assets was governed by 29 C.F.R. § 2618.31–32 [8] which creates a formula

---

**7.** A non-vested participant is one whose benefits are forfeitable. Vested participants are those whose immediate or retirement benefits are nonforfeitable. Nonforfeitable benefits are those to which the participant has a claim which is unconditional and legally enforceable. *See* 29 U.S.C.A. § 1002 (definitional section). For example, if the plan provides that vesting occurs after 10 years service, the contributions become unconditional and legally enforceable by the participant. If the participant is terminated from employment either through lay-off or voluntary separation after the vesting, he still retains rights to the benefits though not to future contributions. However, if the participant's employment is terminated prior to vesting, he loses his claim to the benefits and the contributions remain in the Fund. The Act provides that nonvested benefits become nonforfeitable, to the extent funded, upon plan termination. 29 U.S.C.A. § 1322.

**8.** Current law 29 U.S.C.A. § 1344(d) became effective December 17, 1987 and does not apply to the defendants. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. 100–203, 101 Stat. 1330–1359. The applicable 1985 PBGC regulations found at 29 C.F.R. § 2618.31 dealing with the allocation of residual assets attributable to employee contributions provides in pertinent part:

(b) Unless an alternative method is approved by PBGC pursuant to paragraphs (c) and (d) of this section, the portion of residual assets attributable to employee contributions shall be computed by multiplying the total residual assets by a fraction-

(1) The numerator of which is the present value of all benefits assigned to priority category 2, pursuant to 2618.12; and

(2) The denominator of which is the present value of all benefits assigned to priority categories 2 through 6, pursuant to §§ 2618.12 through 2618.16.

"based on the ratio of the present value of the individual participant's benefits under all priority categories to the present value of all participants' benefits, multiplied by the excess assets which are not to revert." S. Bruce, *Pension Claims: Rights and Obligations*, 613 (1988). Under the PBGC regulations an "irrevocable commitment" is not considered a plan asset and should be excluded from the allocation process. *See* 29 C.F.R. § 2618.4(b).[9]

In deciding whether the Plan did provide for irrevocable commitments, the district court found that the HMW Plan stated that annuities would be purchased at the time of retirement and that the liability for the annuity would be borne by CG. There is evidence of this intent in the way that HMW treated the annuities as irrevocable in its annual report filing with the PBGC and the IRS, and that, upon retirement, the individual retiree's account was transferred to the Retired Lives Account. Thus, it is clear that the Plan was no longer responsible for providing benefits to participants upon retirement once the annuity was purchased.

██ HMW relies on *Victor v. Home Savings*, 645 F.Supp. 1486 (E.D.Mo.1986), to support its argument that the annuities were not irrevocable commitments and contends that the test to determine whether the annuities were irrevocable commitments was whether the "funds used to purchase the annuity have left the fund." *Victor*, 645 F.Supp. at 1492. We believe that the *Victor* court's interpretation is too narrow a reading of 29 C.F.R. 2618.2. The plain language of the regulation requires that the commitment be noncancellable and legally enforceable by the participant in order to be considered irrevocable. HMW relies on the *Victor* opinion to support its contention that this merely means the benefit is vested or nonforfeitable. However, both ERISA and PBGC regulations equate nonforfeitability with the participant's satisfaction of the conditions for entitlement to the benefit. *See* 29 U.S.C.A. § 1002(19) and 29 C.F.R. § 2618.2.[10] Thus, something

---

29 C.F.R. § 2618.31 (1985). The allocation of residual assets among the pool of eligible participants and beneficiaries is governed by 29 C.F.R. § 2618.32 which states in part:

> (b) *Contributory plans that provide for reversion to the employer.* Subject to the provisions of paragraph (c) of this section, the share of each member of the pool of eligible participants and beneficiaries in the residual assets in a contributory plan that provides for reversion to the employer shall be computed by multiplying the residual assets allocable to the pool of eligible participants and beneficiaries, as computed under § 2618.31(b) or (c), by a fraction-
> (1) The numerator of which is the present value of the member's benefits assigned to priority category 2, pursuant to § 2618.12, or the member's contribution remaining in the plan if 2618.31(c)(3) applies; and
> (2) The denominator of which is the present value of all benefits assigned to priority category 2, pursuant to § 2618.12, or all members' contributions remaining in the plan of § 2618.31(c)(3) applies.

29 C.F.R. § 2618.32 (1985) (emphasis in original).

9. PBGC regulations define an irrevocable commitment as:

> an obligation by an insurer to pay benefits to a named plan participant or surviving beneficiary, if the obligation cannot be cancelled under the terms of the insurance contract (except for fraud or mistake) with the consent

of the participant or beneficiary and is legally enforceable by the participant or beneficiary. 29 C.F.R. § 2618.2

10. Congress, by way of ERISA, defined nonforfeitability as follows:

> (19) The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is *unconditional,* and which is *legally enforceable* against the plan.

29 U.S.C.A. § 1002(19) (Emphasis added).

The PBGC defined nonforfeitability as such:

> "Nonforfeitable benefit" means, with respect to a plan, a benefit for which a participant *has satisfied the conditions* for entitlement under the plan or the requirements of the Act (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit that returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition or operation of the Act or the Code. Benefits that become nonforfeitable solely as a result of the termination of a plan will be considered forfeitable.

29 C.F.R. 2618.2 (Emphasis added).

more than vesting is required to make an irrevocable commitment: that is, the obligation by an insurer to pay benefits to a participant which cannot be cancelled.

■ The district court found, and the record supports, that upon an individual's retirement, CG issued a Retirement Annuity Certificate to evidence the annuity purchased by CG for that retiree. Since the annuity represented an uncancellable obligation on the part of CG to pay a certain sum to the retiree, it was the type of irrevocable commitment which the PBGC states is not to be included in the allocation process. *See* 29 C.F.R. 2618.2. Consequently, HMW's inclusion of this figure in the distribution formula ran counter to the PBGC regulations and the ERISA mandate of a fair distribution. We conclude that the district court properly determined that Fechter demonstrated a reasonable likelihood of succeeding on the merits of Count II dealing with the violation of § 1344.

### IV.

We turn now to examine whether the district court erred when it concluded that the plaintiffs had shown irreparable harm. HMW argues that Fechter is interested only in monetary damages and therefore an injunction is improper. In arguing that this court has rejected the alleged inability of a defendant to satisfy a judgment as a basis for granting a preliminary injunction, HMW relies on *Loretangeli v. Critelli*, 853 F.2d 186 (3d Cir.1988).

*Loretangeli* involved a dispute between union officials and some of the members concerning the disbursement of union funds. The suit was brought under the Labor Management Reporting and Disclosure Act, 29 U.S.C.A. § 501 (West 1985) which permits a union member to bring suit against union officials for a breach of fiduciary duty upon leave of the court for good cause. While the suit was pending, the membership applied to the district court for a preliminary injunction prohibiting further disbursements. The district court denied the injunction because it concluded that the members had failed to meet the burden of showing irreparable harm. We reversed, stating, "On remand, the plaintiffs may be able to show non-speculative irreparable harm through the continued rebates to the [union] locals without appropriate financial oversight...." 853 F.2d at 196.

The language upon which HMW relies in *Loretangeli* appears in footnote 17, in which we stated that the membership had raised a meritless argument by contending there was an irreparable harm where the individual defendants would not have sufficient financial resources to meet any damages to satisfy a judgment. 853 F.2d at 196 n. 17. Our holding, however, makes it clear that where the plaintiffs are alleging a harm through the disbursement of payments which are illegal under the union constitution, when the union faces drastic financial constraints, the plaintiffs may have shown an irreparable injury. 853 F.2d at 196.

Nevertheless, we recognize that as a general rule an injunction will not be issued in a money damages case prior to a determination of liability and an award of damages. It is not so much that money cannot be the object of an injunction, but rather, under ordinary circumstances, if a recovery of money damages is available, equitable relief is unnecessary. We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate. *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803–04, 72 L.Ed.2d 91 (1982) ("An injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable.")[11]

---

11. At oral argument, counsel for Fechter stated that counsel for HMW had admitted before the district court that HMW was unable to satisfy any potential judgment in this case. We requested supplemental letters from counsel for both parties to indicate references in the record where these admissions could be found. While most of the references require us to read between the lines to find support for Fechter's counsel's statement that the defendants could not satisfy the judgment, one admission by a witness made at a subsequent hearing regarding

More importantly, Congress provided for the civil enforcement of the ERISA scheme in 29 U.S.C.A. § 1132(a)(3) where it granted a cause of action to any "participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision ... [of ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations...." Thus, Congress demonstrated that it intended that courts exercise discretion and flexibility in ensuring compliance with ERISA.[12]

The district court rejected HMW's arguments and found that it "had broad authority under ERISA to fashion appropriate equitable relief to protect the rights of pension plan participants." *Citing, Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir. 1983). The district court concluded that this right extends to appropriate preliminary injunctive measures to preserve the rights of pension beneficiaries and to ensure the proper distribution of surplus plan assets.[13]

■ The district court relied in part on a recent opinion of the Court of Appeals for the D.C. Circuit to support its view. In *Foltz v. U.S. News & World Report*, 760 F.2d 1300 (D.C.Cir.1985) a class of former corporate employees sought a preliminary injunction to halt the distribution of the U.S. News Profit–Sharing Plan which overvalued the assets of current employees to the detriment of former employees. The question of whether injunctive relief should lie against the Plan itself was redirected to the district court by the court of appeals on remand for the district court to consider whether the Plan will cease to exist as an entity and whether damages—if awarded against the Plan—could be recovered, *i.e.*, were assets available. 760 F.2d at 1309.

Explaining its position that injunctive relief could lie against the Plan, the court in *Foltz* noted that "it would do violence to Congress' intent in carefully framing an arsenal of remedial legal weapons in their watershed statute not to preserve the status quo to the extent of keeping alive an otherwise viable, statutorily provided cause of action...." 760 F.2d at 1309.[14] The

the defendants' motion to stay the injunction was more on point.

> Q: Does Clabir currently have sufficient assets to satisfy a thirteen million dollar [judgment] if one were entered today or June 1?
> A: I would answer no, because their major asset is Ambrit and it is encumbered or securing the bank loan.

Counsel for HMW and Clabir argues we should not use this testimony to support the district court's issuance of the preliminary injunction. Due to our holding, we need not address this argument.

**12.** H. Rep. No. 93–533, *reprinted at* 1974 U.S. Code Cong. & Admin.News, 4639 (1975) described the enforcement provisions of ERISA as permitting

> the imposition of criminal penalties on those willfully violating their duties under the Act. The Labor Department is given primary authority to administer the provisions of the Act, but the Committee has placed the principal focus of the enforcement effort on anticipated civil litigation to be initiated by the Secretary of Labor *as well as* participants and beneficiaries.

1974 U.S.Code Cong. & Admin.News at 4640 (emphasis added).

**13.** HMW argues that the loss by Fechter of the surplus assets is not an injury at all since the surplus is really a "windfall" to the plan participants. One astute commentator has observed that calling the distribution of surplus assets a "windfall" is a misnomer. An excess simply means "that a plan has more assets than may be technically required to provide whatever benefits have accrued...." S. Bruce, *Pension Claims: Rights and Obligations*, 608 ["*Pension Claims*"] (1988). Furthermore, a plan's liabilities for benefits upon termination are less than its accrued liabilities were the plan to continue. *Pension Claims* at 610. Thus, "excess assets are usually not due to the employer's unusual investment acumen. Rather, they are due to the fact that employees don't receive, at plan termination, the full 'accrued liability' the plan's funding targeted." *Id.* at 612.

In addition, terminating plans can often buy lump sum insurance contracts which offer a higher interest rate of investment than the interest which is available for an ongoing fund.

**14.** The court further stated that:

> an equitable remedy designed to freeze the *status quo* as opposed to creating a pool of resources from which members of the plaintiff class could draw prior to a determination of liability and the extent, if any, of damages, would be entirely in keeping with the principles that undergird equity jurisprudence. In consequence, as a conceptual matter, we are convinced that fashioning an equitable remedy—as against the Plan—carefully crafted in light of the entire set of circumstances before the trial court would not, in theory, be improper.

court stressed the difference between a request for an award of money and a request to retain the *status quo* in order to preserve a cause of action. 760 F.2d at 1308–09. On remand, the district court for the District of Columbia found that the employees were "entitled to a preliminary injunction prohibiting the distribution of Plan assets in an amount equal to the unpaid benefits which they may realistically expect to recover from the Plan." *Foltz v. U.S. News & World Report, Inc.*, 613 F.Supp. 634, 649 (D.D.C.1985) (following court of appeals rationale that the loss of a cause of action under ERISA could work an irreparable injury).

We concur with the reasoning of the court of appeals in *Foltz* and its conclusion that the loss of a cause of action would not serve the congressional purpose of ensuring that the contractually defined pension benefits of employees are received by the plan participants and their beneficiaries. *See also Anthony v. Texaco*, 803 F.2d 593 (10th Cir.1986) (relying on *Foltz* ).

■ Here, Fechter has already demonstrated that the Plan assets distributed to HMW have been "advanced" to Clabir. At this point Clabir cannot trace the funds to a single account or demonstrate the continued existence of the surplus. Thus, the district court properly concluded that Fechter would face irreparable harm if an injunction were not issued to preserve the *status quo*. Otherwise, Fechter and the class of plan participants he represents could lose their ERISA entitlement to surplus benefits, a result clearly contrary to the intention of Congress in enacting ERISA.

■ Because a request for an injunction is a request for equitable relief, HMW raises the equitable defense of laches and argues that Fechter waited four to five years before applying for injunctive relief, thereby precluding a finding of irreparable harm. This argument is without merit since the request for a preliminary injunction was filed less than one month after HamTech and the General Defense Corpo-

ration were sold to the Olin Corporation. It was then that the plaintiffs began to realize fully HMW and Clabir's precarious financial situation. Prior to that event, Fechter's request for a preliminary injunction would have been premature since there would not have been immediate and irreparable harm.

■ The district court concluded, and we affirm, that the equities balance in favor of issuing the injunctive relief. First of all, public policy favors a preservation of the employee's right to benefits. It is well known that ERISA was passed to protect pension benefits by providing for the sound administration of the plans and to avoid discrimination and forfeitures of benefits. *See Massachusetts v. Morash*, — U.S. ——, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), *and* 29 U.S.C.A. § 1001. In addition, the harm to Fechter if no injunction were issued outweighs the harm to HMW and Clabir if an injunction were issued. While Fechter stands to lose an ERISA guaranteed right if the *status quo* is not preserved, the defendants will face minor commercial and financial hardships.

## V.

The district court properly issued the preliminary injunction after the plaintiffs had satisfied their burden of showing a reasonable likelihood of success on the merits of Count II and an irreparable injury. The defendants' attempts to undermine the plaintiffs' case fall short of convincing us that the district court abused its discretion or committed an error of law. Consequently, we will affirm the order of the district court granting an injunction to Fechter against the corporate defendants Clabir and HMW Industries, Inc. We have vacated the injunction against the personal assets of the individual defendants, and will vacate the injunction against the corporate defendant, HamTech.

760 F.2d at 1309 (citations omitted).